UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


BRIEN O. HILL,                      .
                                    .
          Plaintiff,                .  CA No. 12-0823 (JDB)
                                    .
     v.                             .
                                    .  Washington, D.C.
ASSOCIATES FOR RENEWAL IN           .  Friday, May 15, 2015
EDUCATION, INC.,                    .  9:35 a.m.
                                    .
          Defendant.                .  Pages 655 through 748
. . . . . . . . . . . . . . . .


DAY 4
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


**APPEARANCES**:

For the Plaintiff:            BRIEN O. HILL, Pro Se
                              1813 18th Street, SE
                              Apartment 4
                              Washington, DC 20020
                              (202) 200-5574


For the Defendant:            SQUIRE PADGETT, ESQ.
                              Law Office of Squire Padgett
                              P.O. Box 70338
                              Washington, DC 20024
                              (571) 733-6407


Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue, NW
                              Washington, DC 20001
                              (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

# C O N T E N T S

Closing Argument By the Plaintiff ................... 666

Closing Argument By the Defendant ................... 687

Rebuttal Argument By the Plaintiff ................. 702

Jury Instructions By the Court ..................... 707

Jury Verdict ....................................... 743

## EXHIBITS RECEIVED

Defendant Exhibit No. 15 ............................658

1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have civil action

3     12-823.  Brien Hill versus Associates for Renewal in Education,

4     Inc.  We have Mr. Brien O. Hill representing himself pro se.  We

5     have Mr. Squire Padgett representing the defendant.

6          THE COURT:  Good morning.  Mr. Hill, are you having

7     trouble with the clock?

8          MR. HILL:  No, sir.  No excuse, but I did leave out

9     early to be here early and they put me with the school children

10    and they got into a fight on the bus.  No cabs would stop, and I

11    had to walk to Anacostia.  Had I not gotten out early, I

12    wouldn't be here now.

13         THE COURT:  Things are always happening.

14         MR. HILL:  Yes, sir.

15         THE COURT:  All right.  How are we on exhibits?

16         MR. HILL:  Plaintiff is missing his originals of

17    Plaintiff's Exhibit 1, 9, and 18.

18         THE COURT:  All right.  That's just tidying up in

19    getting the exhibits.  My question for you, Mr. Hill, is:  Are

20    there any further exhibits to be introduced into evidence?

21         MR. HILL:  Just two.

22         THE COURT:  What two?

23         MR. PADGETT:  Your Honor, I have one question on the

24    exhibits.  I want to know if your records reflect that I moved

25    or offered Defendant's Exhibit 15 into evidence.

1          THE COURT:  It's not reflected that you offered or

2     moved, and in looking at it, I don't remember seeing it.

3          MR. PADGETT:  At this time, I would like to offer as

4     an exhibit, Defendant's Exhibit 15.

5          THE COURT:  This is another of the documents from the

6     manager's desk, therefore from Ms. Bailey?

7          MR. PADGETT:  Yes, sir.

8          THE COURT:  Let Mr. Hill look at it.

9          MR. HILL:  No objection.

10          THE COURT:  Without objection, Defendant's 15 will be

11     admitted.

12                         (Defendant Exhibit No. 15

13                          received into evidence.)

14          THE COURT:  Mr. Hill?

15          MR. HILL:  No further exhibits, Your Honor.

16          THE COURT:  All right.  That takes care of exhibits.

17     So the plaintiff's case has been completed and the defense case

18     has been completed, and there's no further evidence in this

19     case.  Before we begin with the closing arguments, are there any

20     motions?

21          MR. PADGETT:  Yes, Your Honor.

22          THE COURT:  And what is that?

23          MR. PADGETT:  I would like a motion for a direct

24     verdict and to dismiss on plaintiff's claim of retaliation,

25     which the Court has set forth in the jury instructions at page

1   38.

2           THE COURT:  It's now page 34 on the revised

3   instructions.

4           MR. PADGETT:  Okay.  On the revised.  And I believe

5   that the claim is that defendants retaliated against him because

6   he took steps to enforce his lawful rights under the Americans

7   with Disabilities Act.  I believe the record reflects now that

8   the -- you know, all the evidence is in that -- the record does

9   not reflect that ARE retaliated against Mr. Hill.

10          The record reflects that the actions that were taken

11  against Mr. Hill were related to discipline and conduct starting

12  with the -- starting with -- in the record -- with Defendant's

13  Exhibit 7, which is dated as a memorandum, dated 8/2/07 from

14  Ms. Nykia Washington to Mr. Hill, as it relates to him being

15  removed from a position and moved to a part-time status.  And

16  it's part of the reason that it was done, was because of

17  tardiness and -- which is an issue that followed him throughout

18  the relevant time period.

19          And she indicated in that memorandum that if he would

20  refrain from certain conduct that she may, or the agency may,

21  revisit that issue at some later date.  What the record reflects

22  is that Mr. Hill did not refrain from such actions.  In fact, he

23  has said in this record, repeatedly, that he brought to the

24  attention, or sought to bring to the attention and management,

25  all concerns that he may have had, and that included all the way

up -- in the record -- all the way up to the day -- at least a
memo dated December 12, 2008, which is the date he was
terminated.  There's nothing in this record which reflects that
he was repressed or was prevented from saying what he wanted to
say or do things that he wanted to do.

The question is whether those actions were the actions that
were subject to a -- or reached a point where he could be
disciplined because of that, and he was.  And so it wasn't --
and it wasn't because -- or there's nothing in the record that
reflects that he has said, until after he was terminated, that
he was retaliated against.  Retaliation, as is set forth here,
is when a person engages in a protected activity, and because of
that protected activity, an adverse personnel action is taken
against that person.

THE COURT:  Well, arguably he engaged in a protected
activity.  What I'm looking at is whether there's a legally
sufficient basis for a reasonable jury to so conclude.
Arguably, he engaged in a protected activity on September 3,
2007, in a memorandum and then, thereafter, there's some
testimony that he made oral requests, and then again on December
12, as he's articulated it, before the termination -- that's how
he's articulated it.

So why isn't there a legally sufficient basis for a
reasonable juror to conclude that -- notwithstanding all the
reasons that the defendant has articulated -- that what was

1    really going on here was that they didn't want to accommodate

2    his disability, and when he complained of that and sought that

3    accommodation, they retaliated by terminating him.  I'm not

4    saying that's the weight of the evidence, but all that's

5    required is that there be a legally sufficient basis for a jury

6    to so conclude.

7            MR. PADGETT:  But I also think, and I think the Court

8    has stated -- it says -- at page 39 -- it says -- paragraph 2 --

9    it says, "Put another way, you must decide whether Mr. Hill's

10   protected activity was the main reason for ARE's decision."

11   There is nothing in this record -- even taking into account

12   those two exhibits that the Court has referenced -- is that the

13   main reason ARE took action as it relates to the performance

14   improvement plan that ultimately led to the two suspensions and

15   the other actions that were taken against him leading ultimately

16   to his termination were bases for or shows any evidence of any

17   retaliation.

18       And in fact, Mr. Hill's conduct and actions, positive or

19   negative, were so persistent that one cannot say on the basis of

20   this record, that ARE ever took any action to prevent him from,

21   lack of a better word, doing what he wanted to do.  But there

22   are consequences unrelated to discrimination, if those actions

23   interfere with the mission of the agency, and the actions of

24   Mr. Hill, ultimately, impacted the mission of the agency.

25            THE COURT:  All right.

1          MR. PADGETT:  Thank you.

2          THE COURT:  Thank you.

3          MR. HILL:  The plaintiff questions the Court:  To

4    which jury instruction was the defendant reading from?

5          THE COURT:  It's in the new package.  It's pages 34

6    and 35.

7          MR. HILL:  Okay.  I was on 39.

8          THE COURT:  So, Mr. Hill, anything in response to

9    Mr. Padgett?

10         MR. HILL:  Yes, Your Honor.  Throughout the record at

11   trial and sworn testimony by Plaintiff Hill, the pro se litigant

12   in the case, the allegations of violations of protected acts

13   under the ADA for being a qualified disabled employee, made by

14   Plaintiff Hill, were all violated due to the irresponse of the

15   plaintiff's immediate and secondary supervisors.

16         Those requests initiated the chain for which the plaintiff

17   has sworn testimony in trial that were the fabricated reasons

18   for his termination.  Plaintiff Hill's request for accommodation

19   was met with accommodations of monetary gain by way of late fee

20   payments, pseudo-positions of supervisory, as sworn testimony

21   reveals of his coworkers, but no accommodation for the injuries

22   suffered by Plaintiff Hill's tutelage -- I mean, endurance

23   decreasing as he maneuvered the stairs.

24         The protected activity -- I mean, the ADA protects the

25   disabled for making a reasonable accommodation request, and that

request stem from May '07 to -- during the relevant times -- to

his then supervisor Ms. Washington.  The adverse and retaliatory

action for the plaintiff's absence from work and his coverage of

AFLAC payments for that absence -- he was paid by AFLAC -- the

retaliatory action was, upon notice of injury, they placed him

on the third floor while injured.  And as sworn testimony

reveals by the plaintiff, and that action was in the plaintiff's

belief to have him -- to terminate himself by way of quitting

because he couldn't perform his duties, and therefore wouldn't

be entitled to unemployment.

THE COURT:  The claim in this case relating to

retaliation, is a retaliatory termination claim.  In other

words, the retaliatory action would be the termination.  That's

the adverse employment action that's at issue here.

MR. HILL:  Thank you, Your Honor, for clarification.

The retaliatory action is a response of the 16 months of a

continued ADA protected claim.  And the plaintiff has testified

that all actions listed throughout the documentation that both

the plaintiff and the defendant has entered into record, all

infractions of timekeeping, falsification, things are all

fabricated.  And the Court has pointed out that none of the

listed infractions -- well, the infractions vary from the

recommendation and the actual termination.

The recommendation letter being 12/12 and the termination

list actions that are not there.  So it supports the plaintiff's

1   claim that the termination result was -- the reasons for

2   termination were not listed in the recommendation.  A whole

3   nother set of termination reasons were listed in December 15th

4   as they were in December 12th.

5           THE COURT:  All right.  Thank you, Mr. Hill.

6       Anything further, Mr. Padgett?

7           MR. PADGETT:  No, Your Honor.

8           THE COURT:  All right.  I'm going to deny the motion

9   without prejudice.  And consistent with Rule 50 B, the motion

10  can be renewed after the jury has considered this matter once it

11  is submitted to them.

12          MR. PADGETT:  One last question.  I'm trying to figure

13  out which is the final version of the jury verdict form.

14          THE COURT:  We're going to discuss that now.  It's a

15  two-page document that has five questions.  The first question

16  is broken into two parts.  Do you have the one?

17          MR. PADGETT:  Yes.  I have the one which says -- it

18  starts off has --

19          THE COURT:  Ms. Morgan, will you just walk up and show

20  him which one is the final version?

21      (The law clerk complies.)

22          THE COURT:  All right.  Now I'm going to talk about

23  the verdict form for a second before we bring the jury in.  It

24  seems to me that there's a potential issue with the verdict form

25  because as it's crafted right now, the damages are not indicated

1    as relating to a particular claim.

2        Hypothetically -- I'm not saying this is going to happen,

3    but I'm just saying it could happen.  Hypothetically, if the

4    jury returned the verdict in favor of Mr. Hill on more than one

5    claim and awarded some compensatory damages, but I then

6    determined at the end of the trial, that as a matter of law one

7    of those claims could not survive and that a judgment as a

8    matter of law had to be -- it's actually a motion for a new

9    trial -- would have to be granted in favor of the defendant on

10   one claim.  I wouldn't know, no one would know, what damages

11   were attributed to what claim, and we'd then have a problem.

12       So I wonder if I don't need to revise this jury verdict

13   form, slightly, so that I'm asking them to indicate the amount

14   of compensatory damages separately for each claim.

15       All right.  Any objection to that?

16           MR. HILL:  No, sir.  No, Your Honor.  The plaintiff is

17   in full compliance with the situation.

18           MR. PADGETT:  Your Honor, I assume that would be under

19   paragraph 4 -- it would say allegations on Count 1, Count 2,

20   Count 3...

21           THE COURT:  Yes.

22           MR. PADGETT:  I understand and I agree.

23           THE COURT:  All right.  With that, are you ready to

24   make your closing arguments?

25           MR. HILL:  Yes sir, Your Honor.  The plaintiff is

1    ready.

2              THE COURT:  And again, you're expecting 15 to 20

3    minutes, and I've given you a maximum of 40.  I don't expect you

4    to take it.

5              MR. HILL:  Gotcha.

6              MR. PADGETT:  Do you want the final copy of our

7    exhibits now?

8              THE COURT:  No.  Mr. Bradley will have enough time to

9    give them to the jury.

10         (Jury in at 9:57 a.m.)

11             THE COURT:  Welcome back, ladies and gentlemen.  Good

12   to see you.  We are ready now, having completed the presentation

13   of evidence in this case, we're ready now for the closing

14   arguments of counsel and the pro se plaintiff, Mr. Hill, and we

15   will begin with Mr. Hill.

16                  CLOSING ARGUMENT BY THE PLAINTIFF

17             MR. HILL:  Good morning again, Your Honor, members of

18   the court, and members of the jury.  Thank you for being so

19   patient throughout trial.  I can get very long-winded, and I

20   promise that I won't do that in closing here today.

21        The trial presented before you this week was for claims

22   brought by the plaintiff, myself, here for the reasons that my

23   employer failed to accommodate -- make a accommodation for a

24   reasonable request.

25        Under the law, it states, clearly, in its language by the

1   Senate for the Americans with Disabilities Act of 1990, amended,

2   that an employer has a service to supply accommodations not

3   outside of the scope of undue hardship.  Undue hardship would be

4   in this case -- and I'll speak solely to this case -- my request

5   for an elevator in the building, my request for some sort of

6   lift to get me to and from my classroom.

7   That ADA of 1990 to be admitted also covers the plaintiff's

8   reasonable accommodation request to his employer -- to be able

9   to complete his duties with or without that accommodation, and

10  as testimony revealed by all the witnesses called, and even the

11  plaintiff himself, there was never a question of performance on

12  the plaintiff's behalf.  The plaintiff performed his job without

13  a reasonable accommodation but still sought to be at ease and

14  perform his job more effectively.

15  When afforded the accommodations, the combination of the

16  class during the injury, the plaintiff excelled.  He met goals

17  that met rewards from outside entities during his time of

18  employment.

19  There's a second situation in this trial, presented before

20  you, of retaliatory actions taken on behalf of the plaintiff's

21  employer in which the retaliation was due to the plaintiff

22  making that ADA-covered reasonable accommodation request of his

23  employer.

24  And trial revealed, by way of witness and documented

25  evidence, the plaintiff's employer took adverse intentional

1   actions, knowing of a disability throughout his employment,

2   having notice of a injury, and while injured placed him on the

3   third floor of the facility to walk as required, and as

4   testified, 10 flights of stairs to and from his required duties.

5   And then in documents submitted, wrote him up for his inability

6   and willingness to move throughout the facility without -- in

7   his staff assessment in which the plaintiff didn't sign, it

8   noted, "Bathroom Procedures: You must do better."  And as

9   testimony revealed, the basement held the bathroom.

10      The plaintiff was upstairs, injured, with one leg, and

11  placed there from -- he worked for four years on the lower

12  level.  He was assigned a classroom by his then immediate

13  supervisor, one Ms. Foote, and her project manager, Ms. Mungo,

14  with the bathroom attached.  He was removed from that classroom

15  to afford ARE the benefit of a Pre-K classroom.

16      As testified, the billing practices was more for the Pre-K

17  3 classroom than it would have been for the Head Start

18  classroom.  So ARE came into more money with the removal of the

19  Head Start program and the placement of the Pre-K 3 program.

20  That Pre-K 3 program fit within the plaintiff's old classroom.

21      As testimony revealed, while the plaintiff made several

22  requests for accommodation to be relocated, the classrooms were

23  combined in the evening.

24      And testimony given today revealed that -- I mean during

25  trial, that one classroom was a planning period, and that

classroom actually was the one that encompassed that lavatory
attached to the classroom, for the hour where teachers gathered
to plan for their day, while the plaintiff worked upstairs on
the third floor, one leg, no assistance, injured, and being
written up for not performing the duties that would require him
to climb 10 flights of stairs.

Accommodations throughout trial were actually admitted by
the defendant's counsel.  Couldn't someone help you?  Ratios
come into play.  You can't just leave children randomly.  This
is not a office setting.  There are requirements governed by the
DCMR-29 that says per student -- four students -- in just
happenstance, four students require one teacher.  At five you
need two.  So, therefore, the plaintiff couldn't just drop
children off.

And in the cases, and testimony revealed -- and I'll get to
shortly, touch on each witness's statements after I give the
overview of the plaintiff's case -- testimony revealed, by one
Ms. Bailey, who said we were in ratio at all times.  They
definitely were.  One to 15 is the requirement, but the
accommodation was never addressed in regards to the actual
plaintiff making a protected request of his supervisors.

Claims of sympathy on behalf of Ms. Bailey to the plaintiff
given that she was too disabled and placed on the third floor,
shows the agency approach to the disabled.  It was a agency-wide
practice.

1    Ms. Bailey arrived in a wheelchair, crutches, and she was

2    on the third floor with the plaintiff.  Testimony was given that

3    the plaintiff's leg came off, and that's how his second-line

4    supervisor became notice while he played on the floor on the

5    second level.  And he still yet was placed there after on the

6    third floor with an injury as a retaliatory action given in

7    testimony -- by way of testimony of the plaintiff in trial.

8    So I'll go in sequence of the witnesses presented.  In my

9    opening statement, I said that the adverse actions taken against

10   Plaintiff Hill was consistent, repugnant, and flied in the face

11   of legal precedence and basic fair play.  That was all proven.

12   I said the list of transgressions was reprehensible; it

13   walked into wrongful termination which was presented by way of

14   Mr. Gore, who opening statements were that he didn't recall

15   plaintiff's tenure starting in '97.  He knew for a fact.  He

16   didn't say "I don't recall."  He said, no, he wasn't there in

17   '97.  I wasn't, and he wasn't either.

18   Then closer to the date 2011, the question of, do you

19   recall your time of departure, the EEOC standings of the claim

20   brought against the agency?  "No, I don't recall."  But he could

21   remember '97, but he couldn't remember 2011.

22   He made a statement -- he mentioned that he recognized the

23   sexual harassment documents before him and found himself listed

24   in the second paragraph, the closing paragraph of the document,

25   and said that he saw that document; he had came into contact

1    with that document by way of being the CEO.

2         He gave no testimony as to how that document made him feel.

3    When asked did he call a meeting for that document, he replied

4    no.  And how he became aware of the sexual harassment actions,

5    he stated that the plaintiff victims told him directly, and he

6    gestured -- made comment -- he commented in regard to their

7    shape.

8         There was no testimony by the investigator that that even

9    was a situation in which came up in the investigation.  The

10   plaintiff was looking to pad his knowledge.  He stated that the

11   requirement of the -- he reassigned the D.C. Code 4132-01, which

12   states, "Upon suspicion of neglect," and the keyword there being

13   "suspicion."  Not an investigation.  Once you have suspicion,

14   the witness restated that as mandated reporters, yes, we are,

15   upon suspicion, to notify the government parties, be it Child

16   Protective Services, Department of Human Services, the

17   Metropolitan Police.

18        Testimony was then given through trial by the witness that

19   child-protective action clearances were needed for employment.

20   So they were all aware of the requirements by law, mandated that

21   these actions were -- and these actions came December '06, two

22   months following the plaintiff's award ceremony in which the

23   plaintiff attended.  He couldn't recall if he had an invitation.

24        That conversation at the table of the award ceremony was

25   intrusive, it was insulting, and defamation of character all

existed at the table.  So it put a foul taste in the plaintiff's

mouth.  Shortly thereafter, money was awarded by the Wolf Trap

agency for the plaintiff's prestigious award.

And in conversation, early part of December with the CEO,

the plaintiff himself, shortly thereafter, the first allegation

of sexual harassment came by way of, not the victims but the

supervisor to the victims, to Mr. Gore.  As Mr. Gore testified,

their supervisor told me, they questioned the girls, and they

said so on and so forth.  No written statements were submitted

as evidence which should have been a part of the investigation.

I'll move on to Ms. Minor.  Ms. Minor stated that prior to

the determination in December 2011, there was no ADA training.

After 2011, shortly thereafter, ARE received full training on

ADA adjustments and a determination in the claim made by

Plaintiff Hill.

She also stated, I wasn't in the facility headquarters in

'97, but I know for a fact that Plaintiff Hill wasn't there.

And I'll get to why everyone said I wasn't -- the plaintiff

wasn't there.  Both Gore and Minor stated the plaintiff was

outspoken, never bit his tongue, made written requests, verbal

requests; if he caught you walking, he would talk to you.

These were the times in which the plaintiff made the

request:  Hey, I'm on the third floor.  You know I used to work

downstairs.  You were in the training sessions.

Ms. Minor made a statement that Ms. Bailey, in the

manager's meeting, openly expressed insubordination, time
falsification of documents with all the managers.  When
questioned by the plaintiff:  Were supplies brought up in these
meetings?  No, we didn't talk about supplies.  Ms. Bailey
testified that she never talked to Mr. Gore.  She talked
directly to the Human Resources department and Ms. Bester.

So, when questioned by the plaintiff in direct, did you
inform Mr. Gore?  No, never did.  Ms. Minor corroborated that
she heard from Ms. Bailey directly about the plaintiff's reasons
for termination, being insubordinate and falsification of
documents, and disobeying the call-in procedure.

Ms. Minor and Mr. Gore stated, both, that the fiscal year
began in October.  One of the issues addressed with Mr. Gore was
that if the fiscal year started in October, you received monies
from Wolf Trap.

The plaintiff is not asking for merit money at the
Christmas party.  The plaintiff is worried about the duration of
the school year.  If the conversation is that we don't have any
money, for what?  And the plaintiff was informed that this is
out of your scope -- of your need to know.  Fine.

It wasn't a request for merit money after the plaintiff
received the information from Mr. Gore.  His attention turned to
the well-being of the school, hence the reason no one wants the
plaintiff there before '97, because the plaintiff, in his
capacity in '97 through '98, was a direct secretary to the

1    deputy director of education.

2        He and she ran the program downstairs.  The program, ARE,

3    during that time frame, was solely a Head Start-based program.

4    The plaintiff knew the program in and out by the time of his

5    hiring, 10/02.

6        To impeach the witness's testimony, Ms. Minor testified not

7    that "I can't recall."  She said, "No, he wasn't there in '97."

8    Yet couldn't recall whether she was paid weekly, biweekly, or

9    twice a month as stated by everyone else in the record during

10   the relevant times.  But she knew for a fact he wasn't in the

11   facility in '97 in the capacity of secretary to the deputy

12   director of education.

13       And they let me not forego the importance of that.

14   It gives the plaintiff insight into the program in his

15   effectiveness with children.  That effectiveness was looked at

16   as a overachievement by his employers.  Mr. Gore made one

17   statement that, "We made you."  If Mr. Gore could place the

18   plaintiff's employment after his CEO-ship, then he in essence

19   was the hiree, and any accolades that the plaintiff achieved

20   would solely be on his part because he saw something in him.

21       There were many male teaching employees for ARE.  Most by

22   way left to go on to be firemen, policemen, and things of that

23   nature through the connections Mr. Gore has throughout the

24   Metropolitan Police and fire department.

25       In Mr. Hill's case, he can't climb a ladder, so he was

sedentary.  He was there; he had prior knowledge.  He predated

Mr. Gore in seniority as being located at the headquarters.

So when confrontation became about into the handling of monies,

that's an employee questioning his CEO.

As stated in my opening statement, spread throughout the

agency began a chain of gossip.  Later testified, no

confidentiality agreement was circulated at the point of sexual

harassment claims brought against Plaintiff Hill.

It was free open.  The plaintiff had to recant the same

story to everyone, and I apologize for taking 20 days and three

years to explain the sexual harassment situation with the young

ladies.  The second one, I'll get to that.  But as a man,

there's certain things you can't deal with, and these are

children we're talking about, and I have daughters.

So for the allegation here to come up -- and it's not even

a reason for termination -- shows the malice and intentional

harm and defamation, as stated in my opening statement, that the

defendant -- the realms and the procedures and the things that

they go through just to defame the plaintiff, who worked there

before them, had insight from the creator of the DBA program,

being Ms. Richardson, and the first ever manager of the

education department, one Dr. Helen Turner.  There's not a

Dr. Minor; there's not a Dr. Gore.  They're mister and missus.

Brief synopsis on who Dr. Helen Turner was, she was the

reading instructor for the entire DCPS program.  After the

plaintiff was released from the group home services, he came to
Ms. Brenda Strong Nixon.  She sent him to Dr. Turner, and she
said two things:

One, you can work here, but you gotta get a GED.  I was
like, okay.  They had a GED program in which Ms. Peaks, who
testified, and her first children's father were in that program.
It was called City Lights, hence the reason the plaintiff kept
going over and over, were you in there when you were at Dunbar?
Plaintiff knew Ms. Peaks when she was in high school as well.
Plaintiff walked into the center, as you'll see on his resume,
filled out and they made the mistake of asking the plaintiff
about Malcolm X in that narrative.

Onto Ms. Dorn.  Ms. Dorn recalled the plaintiff working in
the kitchen from 11:00 to 12:00; 1:00 to 3:00 covering the
classroom and leaving shortly 10 minutes beforehand to go pick
up the children while they were across the street.  That
encompassed a work frame in the Early Childhood Education on the
second floor of four hours.

The plaintiff petitioned and initiated by the defense, no,
the program started at 6:00.  The plaintiff showed numerous --
started out with just one.  They said only today, seven o'clock,
so they could continue their conversation that, oh, we always
close at 6:00.

Petitioned for, to stay open to 7:00, so that's four hours
and four hours.  And on a part-time position after being

reassigned -- I won't say it demoted.  We'll call, it for the
sake of argument, reassigned -- to the third floor while
injured.  The plaintiff received his salary, hourly-rate, in
double time.

Ms. Dorn, the witness, was the only one who said, "I saw
Mr. Hill in pain on those stairs."  Everyone else?  Oh, no, no,
I never saw him in pain.  I know he was working outside.  He was
playing basketball; there was nothing wrong with him.  So what
happens with your endurance when you're playing basketball?
You're tired.  So try climbing 10 flights of stairs.

You gotta come in, that's one, to wash their hands.
Five up, somebody gotta go back down; that's five down.  That's
11 flights after playing basketball.  They're like, okay, you're
so good with the children in the classroom, but let's see if the
performance works when you're on the third floor.

That was the retaliatory action for the accommodation
request.  The accommodation request was to stay down on the
second floor where he was.  It wasn't as if he was hired and put
on the third floor.  He was downstairs working.  He made a
request; hey, you know I'm injured, I'll be getting a new leg
soon, covered under full-time employment benefits.

Shortly thereafter, the benefits stopped after the first
$7500 payment came in for the replacement of the leg the
plaintiff broke while at the facility.  The time off to recover
was paid through AFLAC, so the plaintiff missed no money.

Part-time employees don't get AFLAC.  He had to come to work and he's effective in the classroom.  So, part-time, that helped him.  Retaliatory action.

$7500 payment for a leg.  What if he needed to be hospitalized next time?  You know how much that runs the bill up?  And this happened right before the fiscal year begin. So when the billing cycle came in, ARE's bill, to the plaintiff's knowledge by way of working for Dr. Turner, insurance came from -- every employee was in the pool.  The money at the end of the year spent on each employee raised or lower your premiums.

So $7500 for the plaintiff -- medical bills for his dying mother, who was covered under the ADA as having an existing condition, known thereof, she would have been covered on 100 percent of the plaintiff's healthcare coverage as a full-time employee.

The retaliation action, there's several.  I told you the list is as long as it is reprehensible.  Ms. Dorn stated she saw the plaintiff take the leg off in her presence.  Plaintiff -- and I asked her, what was he doing when he did that?  He knew she wasn't going to say he was changing his bandage or adjusting his leg.

These actions all transpired at work from '07 to '08, a 16-month span of constant requests, both verbal and written, where the plaintiff would stay up at night, the night before he

delivered, and make the wording as communicable as possible.

Shortly after his mother's passing, he came to ARE with a letter.  No listed transgressions there, just the basic request, because the plaintiff wasn't paid from -- the plaintiff wasn't paid from September '07 to November '07.  He had a second job that supported his family and he.

The plaintiff's dedication to the organization was the two year-olds that he raised.  The only benefit of being on the third floor, those same two year-olds that he had downstairs for those four years were now reading to him upstairs.  And that upset his immediate supervisor who testified her office was next door, because all the other children didn't want to be in any other class than Mr. Hill's.  They had to show him that they made it.  They knew.  When they closed John F. Cook, those students went to CAPS, closest to ARE.

The plaintiff's reassignment to -- oh, I can use exhibits. I'm just going to do one, and I'm going to show you something that is just astounding.  Court's indulgence and the jury's indulgence.

Plaintiff moves to republish -- the relevant time in this case is -- and this is one document.  I won't do the whole span, and I know it was sporadic in coming, because if they saw the way I was coming, it wouldn't have worked.  So I had to come with documents out of sequence.

MR. PADGETT:  Not to interrupt you, but what is the

1  exhibit number?

2          MR. HILL:  Oh, Exhibit No. 40 in the record.

3          THE COURT:  4-0?

4          MR. HILL:  Yes.  Plaintiff's Exhibit 40.

5          THE COURT:  It's in evidence.

6          MR. HILL:  It is?

7          THE COURT:  It is in evidence.  You may show it.

8          MR. HILL:  This document you'll have when you go back

9  says; "The Closing of the Head Start program."  The relevant

10  time is '07-'08.  This is a precursor to that, but the actions

11  of his then deputy director says, "Please be advised that

12  effective 8/31/06, the funding for the Head Start program will

13  end.  As you know, we were given this information indirectly

14  through some parents who had attempted to register their

15  children for the new school year."

16      My parents came to me and said, Mr. Hill, hey, what's going

17  on?

18      What do you mean what's going on?  I'm working.

19      We can't register.

20      Why not?

21      They're closing the program.

22      Ms. Bester, they're closing the program.  "It was not until

23  a few weeks ago that we received the official letter."

24      Ms. Bester knew the program was closing.  I told her that

25  the program was closing.  She constructed this letter, and in

the letter it's evidence that she verified it.  It got in the record by her notification that she wrote this.  That language right there states, and you'll have this in the back, that she knew weeks before the program was closing, she was going to let the program close because of the plaintiff's effectiveness.

We had parents lining up.  They didn't want to go to DCPS schools, hence the reason the satellite centers closed.  I had a long list of Ms. Washington, who was a called witness and shared, unfortunately, she didn't come.  Could testify to -- my first question was:  What was the enrollment of Plaintiff Hill, would have been -- what was the enrollment of Plaintiff Hill's classroom?

Mr. Gore testified that, oh, he was a black male and being with the -- I've had children since 14.  I've been with my little cousins since I was nine.  I was a kid even then, splitting sandwiches four ways.  I've been potty training, because I'm not changing Pampers forever.

THE COURT:  Mr. Hill, remember, you can't state facts that you didn't state from the witness stand.

MR. HILL:  I apologize.

THE COURT:  Don't be adding to the record in the case, please.

MR. HILL:  In the case of Ms. Peaks, I won't get into the record and show the document, but she said, if I was in that meeting, it was a mixed meeting.  Ms. Bailey later testified,

1    this was my meeting.  Ms. Peaks stated, oh, Mr. Hill was late

2    all the time.

3        When you get that document, you'll see that Ms. Peaks was

4    late.  Ms. Peaks was late to that meeting.  Didn't intend for

5    that to be a line of evidence.  All I wanted to show was she

6    didn't work from 3:00 to 4:00 in a planning situation in the

7    Pre-K classroom.  That classroom was open.  That was my intent.

8    But she volunteered information and defend herself and impeached

9    her own statements.

10       Oh, that was a mixed meeting.  Ms. Bailey recognized every

11   one on that student announcement list as employees and students

12   of her program that ran from 3:00 to 7:00.  Ms. Peaks didn't

13   leave at four o'clock; she left at seven.

14       So the point I'm trying to make is, everyone got up there

15   with a preordained speech, a list of questions not to answer.

16   I spent 35 years on the bathroom and the doors.  I apologize.

17   But the sensitivity to the situation would have been that

18   classroom was assigned to me.  No other classroom.  Four

19   classes.  Two offices.  Ms. Bailey could easily have accommodated

20   one of those offices.  Ms. Minor was in that office until she

21   moved downstairs.

22       Ms. Washington was here.  There were two coat rooms, old

23   school coat -- schoolhouse.  So in between two classrooms is a

24   coat room.  They converted the coat rooms into offices.

25   Ms. Minor was on that level.  She'd never attest that, but she

1   was.

2        Ms. Dorn stated Plaintiff Hill was never insubordinate to

3   her, never sexually harassed her.  She witnessed Plaintiff Hill

4   making statements for accommodation.  Plaintiff Hill during

5   meetings stood up and said, hey, before we go, standing

6   objection.  I'm not a lawyer.  I never intended to be a lawyer.

7   But this case cost $450 an hour and has been running the span of

8   six years.

9        MR. PADGETT:  Objection, Your Honor.

10       THE COURT:  Overruled.  I'm not sure -- you can't add

11  in that information at this point.  And Mr. Hill, you've been 30

12  minutes.

13       MR. HILL:  Okay.  So I'll sum up Bester and Bailey.

14  Easy.  In the documents you see, the first thing they did when

15  I gave the document was my signature.  That was the practice of

16  theirs.  If it didn't obtain their signature, it wasn't there.

17  Every document I gave them, they said, it's not mine.  But the

18  documents that I gave them without their signature, they say,

19  oh, yeah, I wrote this.  You know why?  Because it was a rush

20  document.

21       As testified here yesterday by the plaintiff, that body

22  slamming incident happened in the morning.  By lunchtime, that

23  letter was circulated and that lady was completely off the

24  premises.  Plaintiff came to work early to witness the pageant,

25  give some help --

1    So my point is -- and the next one, no signature on the

2    12/12/08 document which recommended plaintiff for termination.

3    The infractions on that termination recommendation were

4    infractions to be terminated.  He wasn't terminated on Friday.

5    Everyone had to look over the letter that he submitted that

6    morning with his request.  No signature on that document.

7    The plaintiff came in on the 12th, gave his letter, because

8    he explained to Ms. Bester, the way that he would approach

9    Mr. Gore.  What you mean there ain't no money?  It's October.

10   We just started.  You're talking about a Christmas party.  Okay.

11   See, Ms. Bailey called the plaintiff and said, we got

12   money.

13   From what?

14   Wolf Trap, where you won.

15   DBA had the contract with Wolf Trap, so they sent it to the

16   director, Ms. Bailey.  She called the plaintiff.  Mr. Gore

17   walked past, "merit money."

18   He went upstairs and got the check.  She told him, and he

19   stated to me, came back, let me explain to you what I was

20   talking about, egg on his face.  No problem.  You said the

21   budget restraints are this and that.  That's money nobody

22   expected, because nobody but Plaintiff Hill won that award,

23   nobody thereafter.  But thereafter, there was no program, as

24   testified.  They stopped the program.

25   So in closing, in my opening statement I said, if you fail

1   to come to a common sense solution to whoever it's for, then the

2   rights protected under the ADA possessed by the plaintiff --

3   because he's known to the defense as having a disability.  He

4   has proven he made requests and alleged that his request

5   resulted in adverse action titled by the defense throughout

6   trial as a progressive disciplinary action.

7       And if you question your decision here today, do me a

8   favor; March 2015, don't go to work on time, fail to call in,

9   get suspended, don't put your signature on a document that your

10  boss and their boss are adamant about signatures.  Do that in

11  March next year.

12      Then, when you get your staff assessment, if you're in

13  disagreement with a accommodation request that you made to be

14  downstairs, and you're written up for not going from the third

15  floor to the basement, and you don't sign that for your boss who

16  is adamant about signatures and their boss is adamant about

17  signatures, do that, same month.  Then thereafter, call in, be

18  insubordinate, all the way up to October.

19      I want you to do these things, and then write "F you" on a

20  birthday list.  Please.  Have a meeting called by your boss with

21  the Human Resources director.  In that attendance, you give your

22  first recommendation that's dated a year old.  Don't get

23  suspended, don't get reprimanded, get sent back to work on the

24  third floor, then get an announcement.

25      Let's omit the mom, and the brother, and the healthcare

requirements, the request made as testified.  Let's forget that.
Let's talk about the reason he was terminated.  And these are
the things I want you to do, because I don't want your mom to be
sick.

     After that, submit a letter on the 12th of December of next
year to your second-line supervisor detailing everything that
has taken place from '06 up until that date.  What, that that's
four years.  Four years back.  Everything that you know.  And
then in that conversation, tell her all the things that are not
on that paper about the on-goings downstairs that, you know,
that you come in early to prevent, as testified.

     Those book readings was to somber the class.  They were in
an uproar.  As testified, they had degreed teachers: Anne Arundel
County, Richmond.  Ms. Chevonne James from New York.  They
couldn't deal with the clientele from Fort Dupont, the Tyler
House.  They didn't know how to approach them.  I was the
buffer, and the teachers, some loved it and some resented it.

     So to keep the degreed teachers for those contracts
Mr. Gore testified to, that they competed for -- and on paper
you look better with degreed teachers, a one-legged black guy in
a classroom?  He has a CDA.  But I got four degreed BA teachers,
one with a master's degree as a director, and then lastly, make
a request to your board of directors for a hearing to discuss
all these transgressions.

     And if that fails, go to the EEOC.  Then you'll see if you

made the right decision here today, because all these things

happened in this trial.  Every document presented by the

plaintiff is valid.  It was a holiday.  They gave me that night

to write it.  I know I was up all night, because that's three

pages.

Every document in the personnel file was under lock and key

by the defendant's assistant who prepared the documents for the

EEOC, this case, presented to the client, all under the key she

testified she held.  So if any document missing, you look for

the keyhole.

I thank you for your time, and I apologize.  In one caveat,

I'm not a lawyer.  I just started watching *Good Wife*.

Thank you.

THE COURT:  All right.  Mr. Padgett.  If we can do the

mic-ing if necessary, Mr. Bradley.

CLOSING ARGUMENT BY THE DEFENDANT

MR. PADGETT:  I don't think I need it.

Good morning.  I'm not going to use the microphone because

I think I talk loud enough, but if my voice drops or something

and you can't hear me, I will start using it, okay?

I am here, as I've said, on behalf of ARE, and this is the

final time that I will get a chance to talk to you.  And so I

welcome this opportunity to do that, to try to pull together

some of the thoughts and things that ARE did, or Mr. Hill did,

during the trial that I believe should cause you to believe and

decide this case in our favor on the basis of this verdict form
which you will receive.  I'm going to -- you'll see it in the
jury room, I'm going to ask that you look at it and say no to
the questions that are asked and that you bring back a verdict
form with no relief and no monetary payments for Mr. Hill.

As I said when I started in my opening statement, and as
you have seen, Mr. Hill is very bright.  No question about that.
He is also very clever.  No question about that.  There is no
question that as a teacher's aide, when he was doing his job in
working with the children, he was good.  There's no question
about that.  We don't question that.

But there is also, as every employee knows and everybody
who has worked -- and I assume based on what each member of the
jury has said, each of you has had a job and/or a career.  And
everyone knows that there is consequences that goes with conduct
and behavior, particularly in the workplace where the agency or
an entity is required to carry out the mission on which it is
tasked.  That requires that, with as much effort as possible,
that everyone is working for the same purpose and toward the
same goals and toward the same missions.

And that includes your -- or at ARE, that includes not only
the behavior and working with the children, which is very, very
important, but it also requires that you work with your
coworkers, carry out the requests, and the orders of your
superiors; your first-line supervisor, second-line supervisor,

1    and the director of the agency.

2         And there are many agencies wherein that, as Mr. Hill has

3    said, that people at ARE knew him.  They knew him.  They had an

4    open-door policy.  They had -- the director knew him; everybody

5    knew him.  He wasn't bashful.  He has said that over and over,

6    that he would bring to the attention of anyone that would

7    listen, what his concerns and actions were.

8         And as the record will show, or has shown, that that

9    included his good behaviors and his bad behavior.  The question

10   is, whether his conduct reached a point where he did certain

11   things that the employer, after having given him notice and an

12   opportunity to improve, did not, and led to his termination and

13   dismissal.  That's what this case is about.  And I will get to

14   the three things or four things that we were asking you to

15   decide as we go through it.

16        As I said when I first started, ARE, Associates for Renewal

17   in Education, is a nonprofit grant-funded agency at 45 P Street,

18   NW, which is right at North Capitol and P Street.  That is an

19   underserved area in the city that ARE is trying to make a

20   difference.

21        Now, I will only -- as I'm going through this, I want you

22   to remember, I am only talking about testimony in evidence.  The

23   law as it relates to the issues that we're talking about, the

24   judge will give you the instructions on that in the jury

25   instructions.  They will instruct and direct you how you are to

consider that in terms of this evidence.

Now, as it relates to the jury instructions, Mr. Hill --
the way the jury instructions are set out, Mr. Hill's claims
start at page 26, and on page 27 the elements of accommodation
discrimination is set forth.  Page 31 is the discriminatory
termination, and page 34 is the retaliatory termination.

Those are the three things or four things that this case is
about.  This case is not about every concern or problem Mr. Hill
had at ARE.  And as you see, he was -- he has a number, and he
was very -- he is still very concerned about them.  And that he
is trying to weave them into this case in a manner such that it
impacts on these three or four issues that he has.

I don't believe that is appropriate.  What is appropriate
is that the time frame for this case is August and September of
2007 to December of 2008.  For example, the exhibit that
Mr. Hill showed you was a year before that.  But that is what
this case is about.

And taking the first element -- or the first issue that
you're supposed to decide, it says that Mr. Hill has said that
he was discriminated against in terms of -- he was terminated
because of his disability.

There is no question that he has a disability.  We have
never denied that.  He had testified that he, because of -- or
that his leg was removed -- or on his right leg, and it left a
stump, and that he has a prosthesis, and that that prosthesis

1    allows him to work.  And he can do the job.

2        What he is saying, though, is that he was terminated

3    because of this disability, and he attempts to say it in a

4    number of ways:  One, he says that he needed an accommodation to

5    perform his job.  What -- and I think you all remember the

6    testimony, I don't have to go through it in great detail -- but

7    that Mr. Hill in 2007, in August of 2007, based on them losing

8    the program in which he was in, he was offered a opportunity for

9    a part-time position as the DBA, a disability -- a teaching

10   students on a part-time basis from 3:00 to 6:30, or 4:00 to

11   7:00, whatever the time was, it was a three-hour time period.

12       And that because the classroom where that was done --

13   because there were students; they were not elementary children,

14   but they were school age children that were from, I believe it

15   was from four to 12.  And that they were from schools in the

16   neighborhood.  They were brought to the school, and that they

17   were -- after getting together or playing on the playground,

18   they wash their hands, they went to the bathroom, they went

19   upstairs on the third floor where the classroom was.

20       The classroom was on the third floor because, as the

21   testimony by several witnesses was, you couldn't mix the

22   children.  The smaller age preschool children with the older

23   children.  There were rules and regulations related to that.

24       Also on the third floor was a second classroom and

25   Mr. Hill's first-line supervisor, a Ms. Bailey, and his

1    second-line supervisor, a Ms. Bester, and who they all testified

2    that Mr. Hill -- they were right across from Mr. Hill and they

3    would come in and they would -- Ms. Bester indicated that she

4    would go about and look in on the classrooms, whatever.

5         Ms. Bailey was on that level and that Mr. Hill, if he had a

6    concern, would come in to see them and talk about it.  There was

7    a bathroom on that floor, there was a bathroom on the second

8    floor.  And a larger number of bathrooms were in the basement.

9    No question about that.

10        Now, Mr. Hill has said that he had problems going up and

11   down those steps, and the record doesn't show he had problems

12   going up and down the steps.  What the record shows is that he

13   is saying that he had to go up and down the steps a number of

14   times.

15        Ms. Bailey, who is also disabled, also had to go up and

16   down those steps.  And I must say based on something Mr. Hill

17   said, Ms. Bailey did.  She came in in a wheelchair.  But at the

18   time Ms. Bailey was employed by ARE, she could still walk, even

19   though her left side was paralyzed, she would go up and down

20   those steps.  And it's obvious that her disability is -- the

21   severity of it is increasing.

22        Now, what happened is Mr. Hill said -- has said that he

23   made, during the relevant time period, made two requests for an

24   accommodation.  One in September of 2008 and one in December of

25   2008.  Let me retract that.  I believe it was September of 2007

1    where he made the request.

2        Now, interestingly enough, in both instances -- and you saw

3    a number of witnesses, who I will go through, who said that they

4    do not recall, or Mr. Hill did not make such a request to them.

5    And that in both instances, those records are not in his

6    personnel folder.  And in the one that is most peculiar, at

7    least to me, is the one of December of 2008.  That was --

8    December 12, 2008 -- that was the date Mr. Hill was notified

9    that he was being terminated.

10       It was done in the testimony we have with Ms. Bailey,

11   Mr. Gore, and Ms. Holloman, if I've got it right.  Mr. Hill says

12   -- and they presented him with his list of infractions and they

13   indicated that he was going -- they were going to recommend

14   termination.  But they don't indicate that he gave them this

15   memorandum dated the same day.

16       His testimony now is that he stayed up all night, that he

17   came in -- I think he said he came in early and gave it to

18   somebody.  Nobody remembers it, but he is saying -- but they do

19   say they brought him in, he acknowledges they brought him in and

20   gave him the document that said they were recommending his

21   termination.

22       There is -- and you have to sort out who you believe, but

23   the record is clear that no one, including him, disagrees that

24   he was brought in, and they gave him that notice.  But everyone

25   disagrees -- or the others disagree that they received or got

1   this notice on the same day.  That is --

2       And Mr. Hill's testimony, interestingly enough about that

3   document, and it's Mr. Hill's Exhibit 50, if you recall, he said

4   in the paragraph -- the introductory paragraph says what his

5   real concern was, wasn't about a disability.  His real concern

6   was about a coworker who had mistreated a child, and it upset

7   him so, that he wanted to bring it to the attention of

8   management and that that was his primary interest.  And that was

9   why he spent that time drafting that notice.

10      That's very different than saying that he was doing it

11  because he was being discriminated against because of his

12  disability and the reason for his termination.

13      Now, the other exhibit was he said that he gave it to -- or

14  Ms. Bailey was asked about it, and Ms. Bester.  Neither one

15  remembered it.  And they were both his supervisors, and they

16  were saying that they had normal and continuing contact with

17  him.  So you have to make that decision as well.

18      Now, as it relates to his claim of retaliatory termination,

19  he said he was terminated in retaliation for him bringing to the

20  attention of ARE the fact that he was disabled and wanted an

21  accommodation, and he was subsequently terminated for that.  But

22  this record is replete that ARE did not retaliate against

23  Mr. Hill.

24      Mr. Hill, starting in -- in terms of evidence in the record

25  -- starting as far back as when he left or when he lost his

full-time position and was transferred in 2007.  You'll look at

the exhibits, and I'll give you a list of them before I close,

is that Ms. Nykia Washington who was his supervisor before

Ms. Bailey, and Ms. Bester was always his second-line

supervisor, one of the things that Ms. Washington said in April

29 of 2007, she had given him a recommendation.  Talking about

his good deeds and he'd make a good employee.

By August, when he left, in the exhibit there, she talks

about, and he used these words, "If I would keep my mouth shut

in terms of talking about management or my supervisors, that

they would reconsider me for a position, possibly reconsider me

for a full-time position later on."  Those were his own words.

And if you look at the document, this is before he says

that -- apparently they started retaliating against him -- if

you look at that document, the one thing she talks about is his

tardiness in getting to work on time.  That is a common thread

throughout his tenure there from 2007 to 2008.  You could be a

good employee when you're there, but you don't help the agency

or management carrying out the mission if you aren't there or if

you get there late, put more work on your coworkers and others.

Now, from that day forward, Mr. Hill started having

problems.  It became such an issue that -- there was testimony

-- that there was a meeting about his behavior and conduct, and

he was put on a performance improvement plan.  That was in the

fall of 2007.  And it was -- Ms. Bailey was his supervisor, and

1    she started noting and paying attention and counseling him.

2       Mr. Hill views the memos from the manager's desk talking

3    about his behaviors that he said he was always first.  It turned

4    out he was one of the more senior ones, but one of the reasons

5    was, she was continuing his counseling, which was necessary as

6    part of the performance improvement plan.

7       That led to March of 2008.  March 21 is the date of the

8    exhibit, where -- that he was walked or suspended for three

9    days.  Mr. Hill is attempting to say that -- and I think his

10   testimony was that Ms. Bailey changed when he knew her earlier

11   -- when he had worked with her earlier, she was different, but

12   when she came over she got a car and a promotion and this.  She

13   changed.

14      Well, the reason she changed is because his conduct and

15   behavior was unacceptable.  If he is saying his conduct and

16   behaviors were the same before then, the record would suggest he

17   probably should have been terminated before that.  But he

18   wasn't.

19      He was walked for three days for very specific things that

20   were documented.  From that, after he came back, the record

21   reflects that his performance did not improve and it led to

22   several other instances.  And I won't take all the time, but it

23   did lead to an instance in October where he was suspended again,

24   and in the same memo, she specifically points out that it was

25   for the similar conduct that he had been suspended for back in

1   March.

2       And Mr. Hill, his actions, and the documents will show,

3   that he was written up on several different occasions for

4   actions, including using profanity, accuracy in time sheets,

5   leaving his second-line supervisor.  On one occasion, checked

6   his classroom and it turns out that he had left early, and

7   obviously he was going to get written up about that because his

8   supervisor was -- I mean his first-line supervisor was told that

9   by his second-line supervisor.  In every instance where I've

10  been involved, if my second-line supervisor told my first-line

11  supervisor something, I became aware of it very, very quickly.

12      And Mr. Hill was done the same.  So he wasn't treated any

13  differently.  And it wasn't in retaliation for him having given

14  notice if he did, that he wanted an accommodation.  This was for

15  specific actions that he was taking.

16      Now, you can see the rest of that through the exhibits that

17  we will have that you will take into the jury room.  Also, what

18  I'd like to turn my attention to is the witnesses.  Witness

19  credibility is important.  Who was telling the truth?  Or who

20  could or could not remember?

21      Let's start off with Ms. Bailey.  Ms. Bailey was Mr. Hill's

22  first-line supervisor, and she testified here.  He has even

23  testified that she walked up and down the stairs to get to her

24  job.  And she was paralyzed on one side of her body.

25      She was asked a number of questions.  When she couldn't

remember, she said she didn't recall.  Even in instances where there was a document that may have been presented to her that may have been negative toward her or was not favorable toward her.  Including this document that's in evidence talking about the Klu Klux Klan.  She said that, yes, she recalled the document.  There was somebody else there she remembered, but she did not back off and say, I don't remember.

What she said was, yes, she remembered, and so forth and so on.  So when she talked about the reasons given for her progressive discipline of Mr. Hill, it suggests that she had a basis for doing this.

Ms. Bester, who was his second-line supervisor, said that -- how long she had known Brien, how he would walk into her office and this.  But when she asked about any of the problems, she indicated what the problems were.  And if she said she didn't remember a document -- and this is 2015, as Mr. Hill has pointed out, and the time when these actions occurred is in 2008, that's seven years.  And she no longer works there.  Ms. Bailey no longer works there.  And so they've moved on.

And all of this is specific to Mr. Hill.  Mr. Hill wasn't the only employee they had.  He wasn't the only DBA.  He wasn't the only DBA that they counseled.  In those documents that reflect the meetings from the manager's desk, there are a number of occasions where Ms. Bailey talks about the deficiencies of all the employees that were there.  That's what a good manager

does.

And because you are one of the people she is disciplining, you have -- what she's trying to tell you is to straighten up and work with me.  Do things the way we want them done.  You don't run the agency.  That's not retaliation, folks.  That's managerial action to carry out the mission of an agency.

Now, Ms. Holloman, who testified and was the custodian of the records, Ms. Holloman indicated that she had the HR responsibility for 100 employees, plus or minus.  I would like to see how many of you, or us, could carry on all of the responsibilities of a HR manager for 100 employees without assistance.  And she also indicated that she did not recall seeing the documents that Mr. Hill -- Plaintiff's Exhibit 50 and the other exhibit.

And even Mr. Hill's coworker, who was not a joint witness, one Ms. Peaks -- I think you recall, she was a coworker -- Ms. Peaks testified about what she remembered, but she also said that Mr. Hill had a problem about being late.  That's his coworker saying that.

So that was a common thread throughout.  Mr. Hill's concerns are -- he is saying that the exhibits used to terminate him, and they are Defendant's Exhibits 19, 20, and 21 -- he points out that the exhibits on a couple of them list different things.  What it suggests that there were a number of things that he was doing that were sufficient to terminate him.  And

1   they were cumulative, and it was a pattern of conduct.

2         Now as it relates to Mr. Hill in these exhibits, first on

3   the exhibit where he said that he worked all night.  The second

4   exhibit -- which was the first one, he indicated that he gave

5   the document to his supervisor, Ms. Bailey, on September 3 of

6   2008.

7         THE COURT:  Seven.

8         MR. PADGETT:  Oh, yes, Your Honor.  I'm sorry.

9   September 3, 2007.

10        THE COURT:  And just as a reminder, you've been about

11  35 minutes.

12        MR. PADGETT:  I will finish up, Your Honor.

13        The point is this:  Even he couldn't remember accurately

14  how and what as it relates to some of these exhibits, because

15  when I pointed out to him that that was the first Monday in

16  September, which is -- I think everyone knows the first Monday

17  is September is always Labor Day, he then said he gave it to her

18  shortly thereafter.  So even his recollection as good as it is,

19  and it was very good, is not infallible.

20        Now, as it relates to the damages in this case, first of

21  all I'd ask you to make a finding that he is not entitled --

22  that there were no violations.  And two, I'm asking that even if

23  you find that there may have been some violation, then the

24  question is:  What is the measure of damages?  And all of that

25  is taken care of in the jury instructions.  But on the basis of

what I heard Mr. Hill say, I don't think he's entitled to
damages.

He said, and Ms. Bester pointed out, that even as a
part-time employee, they did not reduce his hourly rate down so
he was making more than the other DBAs.

Secondly, he -- when asked about where he had another
part-time job, I asked him how much he had made for that.  He
didn't know because he said he had not filed taxes.  Then he
went through a litany of things.

When the judge asked him and I asked him, for damages.
One about his -- while it's hilarious, it's state of mind, about
his daughter's prom, her inability to go to the prom.  He said
his brother was depressed because his mother was deceased, and
that made him depressed.

Anybody would be depressed if they lose their mother.
I'm  not trying to belittle him; we're not trying to belittle
him.  But there are rules of how cases are litigated, and he has
to abide by them.  He said he lost his car, and he indicated a
number of other things that are not the immediate in the cause
of his injuries.

He was talking about his prosthesis.  Even he talked about
when he broke it on the playground.  He attempted to weave a
story that he had tried lifting or bringing some furniture in
two or three days before, but he also said it is not clear why
and how his prosthesis broke.  And I think everybody knows from

common sense, that anything that is mechanical has wear-and-tear

and will eventually wear out, and it has nothing to do with a by

or anything of a particular employer.  It has to do with the

normal wear-and-tear.

So I'm asking you to find that he is not entitled to

compensatory damages, and under no circumstances is he entitled

to punitive damages, which would be if the employer had taken

certain kind of malicious conduct, and the judge's instructions

will include all that.  But I don't think he -- he should not be

entitled to it.

Now, finally, as I started off, I will not get a chance to

speak to you again on behalf of ARE and Ms. Holloman and the

organization.  So I ask you to, as I know you will, take the

information that's presented to you, view it seriously, and I

ask you to come back with a verdict of no relief for Mr. Hill.

And with that, I thank you.

THE COURT:  All right.

Mr. Hill, you have about three or four minutes if you have

anything further that you wish to say to the jury at this time.

REBUTTAL ARGUMENT BY THE PLAINTIFF

MR. HILL:  I didn't know I could have this portion; I

would have took notes.  Some of the things that defense counsel

has touched on made my case even stronger.  The fact that they

had prior knowledge, the fact that I was outspoken, I approached

my supervisors both first and second line, the fact that

Ms. Washington wrote a letter of recommendation for me in March.

May '07 I had suffered a fall; August '07 I was sent to the

third floor.  In that reasoning, tardiness from work, absence

from work, AFLAC was paying for my absence, they had leave slips

for my absence.

Ms. Bester became aware of my absence, and the uproar of

the students in my absence.  So she began the micromanaging.

This is all documented.  As he stated, if his second-line

supervisor tells him to do something, that becomes his sole

doing.

Well, guess what, Ms. Bester was Ms. Washington and

Ms. Bailey's second-line supervisor.  And the documents

submitted in the evidence, there's a time change.  Oh, and

e-mails from Ms. Bester to Ms. Bailey:  I went to Mr. Hill's

classroom.  Didn't say she went to anyone else's.

I went to Mr. Hill's classroom, 6:10, he wasn't present.

Who was with the children?  None of her concerns that there were

like eight children just running around the room and I wasn't

there.  No reprimand.  Ms. Bailey marked it the next morning,

6:10.

The reason I didn't sign out that day because Ms. Bester

took the sign-in book when she realized I walked past her

office.  She had no idea that Ms. Bailey was going to read that

e-mail and sign me out the next morning -- when she got there in

the morning, she signed me out at 6:10.  When I arrived the next

day, who signed me out?  I had no knowledge of the e-mail.  She

said oh, Ms. Bester; let me change it.  Put 7 o'clock, and

you'll see in the document, that's her signature under there.

That was the practice of Ms. Bester, every day, the

micromanaging of me, for whatever reason.

Some that wasn't in testimony so I can't elaborate on.  And

to close, again, the infractions presented before you the jurors

today, and throughout trial, if you see fit to practice these

and see how far you can get from March with this type of

behavior, can you make it to October of the same year?

And he said I submitted two written recommendations.  There

were numerous, but it's been a span of six years.  He said, it's

2015; no one remembers, but they can remember '97.  They didn't

say I don't remember him.  They said no.

Direct questions through my interview -- process off.  I'm

like, okay, no.  What do you mean no?  And it just threw me for

a loop, because I prepared this case for order of witnesses to

be presented to me.  That stack of paper, I shuffled like cards

every lunch break.  Because I'm like, they coming out of

sequence; I had this ready.

I'm going to ask this person this question, it's going to

be admitted, and by the time the second one come, they're going

to say they didn't, and I can show them.  It's already in.  I

was getting papers in on -- off people.

Ms. Washington didn't appear.  We set up witnesses to come.

We shared five witnesses.  All the witnesses that testified here today are former and current employees of ARE.  Ask yourself, if that's your livelihood, in Ms. Peaks's case, five children to feed, would you go against your employer for a past employee who's bringing you to federal court?

Ask yourself in the case of Ms. Dorn who worked for 20 years in the same job.  She stated, nobody was a teacher; I don't have teaching credentials; he wasn't a teacher either.

Would you go and chance your livelihood for 20 years consistently?  Ms. Dorn is a great teacher.  She won that merit money of 500, and I -- I can't say that.  But I called those two, because I thought that somewhere along the line I would pull at their heartstrings and be like, you saw me bleeding. You saw me pussing on the third floor.  You gotta do something.

And last, he says that the 12th letter was in response to the body slam.  I did my part as a mandated reporter.  Ms. Lewis can no longer work with children.  That letter was about the practices of the agency.  I wasn't trying to run the agency. I was in my position.  If I was trying to run the agency, there would be testimony that I didn't do my job.  How can you run the agency and do your job?

They trying to make me insubordinate.  Insubordination means I'm refraining from my work until you give me what I want. I did my work every day, effectively.  I won awards, and they demoted me and reassigned me.  I got hurt, they put me on the

1   third floor to hurt me.  If I quit, no unemployment.

2       August '07, I didn't get paid for two months straight.

3   They said, my back-pay was already paid in my salary, so they

4   had to catch me up.  Quit please.  You hurt?  Oh, you're getting

5   AFLAC.  Put him on the third floor with the leg until we get the

6   new one.

7       We paid $7500 for that one.  He got paid $9,000 to keep it.

8   But we're not going to pay him.  He says, oh, September 3 was a

9   holiday.  My mother died.  I'm counting days?  No condolences.

10  No bereavement.  Come to the cookout.  Really?  That was the

11  practice of the agency, and it's not Ms. Bailey's fault --

12              THE COURT:  Mr. Hill, you need to finish up.

13              MR. HILL:  Yes, this is the last statement.  It's not

14  Ms. Bailey fault, it's not Mr. Gore's.  I have no malice toward

15  any one of them individually, and they can tell you that.

16  Everybody had a part to play in this because they had to sustain

17  their livelihood.  None of them testified that they had a second

18  job.  All of them's livelihood was ARE.  I learned a long time

19  ago from Dr. Turner; a nice place to visit, you don't want to

20  live here.

21      I thank you for the opportunity for you to hear my case,

22  and that's it.

23              THE COURT:  All right.  Thank you, Mr. Hill and

24  Mr. Padgett.

25      The case is now submitted.  We will return after our

1   morning break for jury instructions.  Those will take about a

2   half an hour for me to give you, and then you'll retire to begin

3   your deliberations.

4        So let's take our morning break first.  Again, don't start

5   discussing the case yet.  Wait for the jury instructions, and

6   then you'll begin and have plenty of time to deal with the case.

7   So we'll see you in about 15 minutes.

8        (Jury out at 11:20 a.m.)

9            THE COURT:  Let's make sure those exhibits are together.

10           MR. HILL:  Your Honor, the plaintiff moves to request

11  1, 9, and 18 of the plaintiff's exhibits.  I don't have the

12  originals or the copies.

13           THE COURT:  Mr. Bradley will help you make sure you

14  get copies, so the copies can go to the jury.

15       And Mr. Bradley, my books are here if you need to get

16  something out of them and get a copy of it you can, certainly.

17  See you in a few minutes.

18       (Recess from 11:20 a.m. to 11:37 a.m.)

19                           JURY INSTRUCTIONS

20           THE COURT:  Welcome back, ladies and gentlemen.

21       Now that you've heard the evidence and the arguments of

22  counsel, it's my duty to instruct you on the law applicable to

23  this case.  It's your duty as jurors to follow the law as I

24  shall state it to you and to apply that law to the facts as you

25  find from the evidence in the case.

1        You're not to single out one instruction alone in stating

2    the law.  You must consider the instructions as a whole, nor are

3    you to be concerned with the wisdom of any rule of law stated by

4    him.

5        Mr. Hill and Mr. Padgett have quite properly referred to

6    some of the governing rules of law in their arguments.  If,

7    however, any difference appears to you between the law as stated

8    by Mr. Hill or Mr. Padgett and the law stated by me in these

9    instructions, you are, of course, to be governed by my

10   instructions.

11       Nothing I say is to be taken as an indication that I have

12   any opinion about the facts in the case.  It's not my function

13   to determine the facts.  Rather, that is your responsibility.

14   You must perform your duties as jurors without bias or prejudice

15   as to any party.  The law does not permit you to be governed by

16   sympathy, prejudice, or public opinion.

17       All parties expect that you will carefully and impartially

18   consider all of the evidence, follow the law as it is now being

19   given to you, and reach a just verdict regardless of the

20   consequences.

21       My instructions will be roughly divided into four parts:

22   First, I will talk with you about some general principles of the

23   law.  Next, I will instruct you on evaluating the evidence.

24   Then, I will discuss with you instructions that apply to the

25   elements of the particular claims in this case, and finally, I

1    will have some closing remarks about your deliberations in this

2    matter.

3    For those of you who are taking notes, I want to let you

4    know that a written copy of these instructions will be available

5    for you as you begin your deliberations.  Let me start with some

6    general principles.  First, I am sure you understand by now that

7    the jury and the Court, you and I, have quite different

8    responsibilities in a trial.

9    The function of the judge is to conduct the trial in the

10   case in an orderly, fair, and efficient manner.  A judge must

11   also rule on questions of law arising during the trial and must

12   tell you the law that applies to this case.

13   It is your duty to accept the law as I state to you without

14   questioning the wisdom of these instructions.  In other words,

15   even if you disagree or do not understand the reasons for any of

16   the instructions, you are bound to follow them.

17   Your function as jurors is to decide the facts.  You are

18   the exclusive judges of the facts.  You alone determine the

19   weight, the effect, and the value of the evidence and the

20   believability of the witnesses.  You should decide the facts

21   only from a fair evaluation of all of the evidence, without

22   prejudice, sympathy, fear, or favor.

23   During the course of the trial, you've heard references to

24   the terms plaintiff and defendant.  To put it as simply as

25   possible, the plaintiff is the person who starts a lawsuit, and

the defendant is the one who is sued by the plaintiff.  During

your deliberations, however, you must not attach any

significance in weighing the evidence to the terms plaintiff and

defendant.

In other words, the fact that the plaintiff has filed a

lawsuit against the defendant does not mean that the plaintiff

is entitled to your verdict or that his evidence is entitled to

greater weight than the defendant's evidence.  The plaintiff

must prove every element of his claim against the defendant by a

preponderance of the evidence before he is entitled to prevail.

It is your duty as jurors to consult with one another and

to deliberate, expecting to reach an agreement.  You must decide

the case for yourself, but you should do so only after

thoroughly discussing it with your fellow jurors.  You should

not hesitate to change an opinion when convinced that it is

wrong.  You should not be influenced to vote in any way on any

question just because another juror favors a particular decision

or holds an opinion different from yours.-

You should reach an agreement only if you can do so in good

conscious.  In other words, you should not surrender your honest

belief about the effect or weight of evidence merely to return a

verdict or solely because of other jurors' opinions.

Remember that you are not advocates in this matter.  You

are neutral judges of the facts.  The final test of the quality

of your service will lie in the verdict that you return in this

1    courtroom.  We will make an important contribution to the cause

2    of justice if you arrive at a just and proper verdict in this

3    case.

4        Therefore, during your deliberations in the jury room, your

5    purpose should not be to support your own opinion but to

6    determine the facts.  You must treat and consider all of these

7    instructions as a whole.  You must not single out any particular

8    instruction or sentence while ignoring others.  You must give

9    each instruction equal importance and consider each one equally

10   with all other instructions.

11       The law permits me to comment to you about the evidence in

12   the case.  My comments are only my opinions about the facts, and

13   you are not bound by my opinions.  If, during the course of this

14   trial, or the giving of these instructions, I have made or make

15   any comment on any evidence, you are free to disregard the

16   comment.  Remember, you are the sole and exclusive judges of all

17   questions of fact in this case.

18       During the course of the trial I may have asked questions

19   of a witness to obtain information or to bring out facts.  You

20   should not take my questions to witnesses as any indication of

21   my opinion about how you should determine the facts.  If I have

22   said or done anything at any time during this case, including

23   giving these instructions, which seem to indicate my opinion on

24   any of these matters, then I instruct you to disregard that

25   indication.

1   Nothing I have said or done should influence you or suggest

2   to you that I favor any party in this case.  I have not meant to

3   express or to suggest any opinion about which witnesses should

4   be believed or which facts are established.

5   There may have been times during the trial when one party

6   made an objection to a question asked by another party or to an

7   answer given by a witness.  It is the duty of a lawyer or a pro

8   se party to make objections if he or she believes something

9   improper is being done.

10  When I sustained an objection to a question, the witness

11  was not allowed to answer it.  Disregard the question, and do

12  not attempt to guess what the answer might have been had I

13  allowed the question to be answered.  Similarly, when I told you

14  to disregard a particular answer and I ordered it stricken, you

15  should have put that statement out of your mind and you may not

16  refer to that question or that stricken answer during your

17  deliberations.

18  Likewise, if I sustain an objection to any exhibits or

19  order them stricken, then those stricken exhibits are not

20  evidence, and you must not consider them.

21  While it may have been natural for you to become impatient

22  with the delay caused by objections or other portions of the

23  proceedings, you must not let your feelings in any way affect

24  your deliberations.  Those interruptions concerned legal matters

25  and while your job is to decide the facts, you should not be

1   influenced by anyone's objections no matter how I ruled on them.

2   Our system of justice requires that you decide the facts of

3   this case in an impartial manner.  You must not be influenced by

4   bias, sympathy, prejudice, or public opinion.  It is a violation

5   of your sworn duty to base your verdict upon anything other than

6   the evidence in the case.

7   In reaching a just verdict, you must consider and decide

8   this case as an action between persons of equal standing in the

9   community and of equal worth.  All persons stand equal before

10  the law and must be treated as equals in this court.

11  You may consider only the evidence properly admitted in the

12  case.  Evidence includes the sworn testimony of witnesses,

13  exhibits admitted into evidence, and facts stipulated and agreed

14  to by counsel.  You may consider any facts to which all counsel

15  have agreed or stipulated as undisputed evidence.

16  In arriving at your verdict, you are to consider only the

17  evidence in the case.  When you are considering the evidence,

18  however, you are not limited solely on the statements of the

19  witnesses.  You are permitted to draw from the evidence any

20  inferences or conclusions that reason and common sense lead you

21  to make.  You should not engage in speculation or make a

22  decision based upon conjecture, however.

23  Statements and arguments of the lawyers or pro se parties,

24  such as their opening statements and closing arguments, are not

25  evidence.  They are intended only to help you understand and

interpret the evidence from each party's perspective.  The

questions that the lawyers or pro se parties ask are not

evidence.  Lawyers' questions that contain an assertion of a

fact does not provide evidence of that fact.

This is true as well of Mr. Hill when he is acting as a

lawyer.  That is when he is giving an opening and closing

statement or asking questions of witnesses.  However, when

Mr. Hill gives testimony on the stand, under oath, that is

evidence that you may consider.

During this case your attention may have been called to

certain evidence.  If you remember that evidence differently

from the way Mr. Hill, Mr. Padgett, or I stated it, then you

should disregard our characterization of the evidence and rely

instead upon your own memory.

The party who makes a claim has the burden of proving it.

This burden of proof means that plaintiff must prove every

element of his claim by a preponderance of the evidence.  To

establish a fact by the preponderance of the evidence is to

prove that it is more likely so than not so.  In other words, a

preponderance of the evidence means that the evidence produces

in your mind the belief that the thing in question is more

likely true than not true.

If, after considering all of the evidence, the evidence

favoring the plaintiff's side of an issue is more convincing to

you and causes you to believe that the probability of truth

favors the plaintiff on that issue, then the plaintiff will have succeeded in carrying the burden of proof on the issue.

The term preponderance of the evidence does not mean that the proof must produce absolute or mathematical certainty.  For example, it does not mean proof beyond a reasonable doubt as is required in criminal cases.  Whether there is a preponderance of the evidence depends upon the quality and not the quantity of evidence.

In other words, merely having a greater number of witnesses or documents bearing on a certain version of the facts does not necessarily constitute a preponderance of the evidence.  If you believe that the evidence is evenly balanced on an issue the plaintiff had to prove, then the plaintiff has not carried the burden of proof, and your finding on that issue must be for the defendant.

In determining whether any fact has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that fact regardless of who produced it. A party is entitled to benefit from all evidence that favors that party whether he or she produced it or his or her adversary produced it.

There are two types of evidence:  Direct and circumstantial.  Direct evidence is the direct proof of a fact such as the testimony of an eyewitness.  Circumstantial evidence is indirect evidence of a fact which is established or logically

1    inferred from a chain of other facts or circumstances.

2         For example, direct evidence of whether an animal was

3    running in the snow might be the testimony of a person who

4    actually saw the animal in the snow.  Circumstantial evidence

5    might be the testimony of a person who saw the tracks of the

6    animal in the snow rather than the animal itself.

7         You may consider both types of evidence equally.  The law

8    makes no distinction between the weight to be given to either

9    direct or circumstantial evidence.  The law does not require a

10   greater degree of certainty for circumstantial evidence than for

11   direct evidence.  You should weigh all of the evidence in the

12   case, both direct and circumstantial, and find the facts in

13   accordance with that evidence.

14        In evaluating the evidence and deciding what the facts are,

15   you must consider and weigh the testimony of all the witnesses

16   who have appeared before you.  You are the sole judges of the

17   credibility of the witnesses.  In other words, you alone are to

18   determine whether to believe any witness and to what extent any

19   witness should be believed.

20        If there is any conflict in the testimony between a

21   witness's testimony and other evidence, it is your function to

22   resolve that conflict and to determine where the truth lies.  In

23   deciding the credibility of any witness, you may consider any

24   matter that may have a bearing on the subject.

25        You may consider the appearance and the behavior of the

witness on the witness stand; whether the witness impresses you

as a truthful individual, whether the witness impresses you as

having an accurate memory and recollection, whether the witness

has any motive for not telling the truth, whether the witness

had full opportunity to observe the matters about which he or

she has testified, whether the witness has any interest in the

outcome of the case, or whether the witness has any friendship

or animosity toward other persons concerned in the case.

You may consider the reasonableness or unreasonableness and

the probability or improbability of the testimony of a witness

in determining whether to accept it as true and accurate.  You

may consider whether the witness has been contradicted or

corroborated by other credible evidence.

If you believe that any witness has shown himself to be

prejudiced or biased, either for or against either side in the

trial, you may consider and decide whether that bias or

prejudice has colored the testimony of the witness so as to

affect the witness's desire and capability to tell the truth.

You should give the testimony of each witness as much weight as

in your judgment it is fairly entitled to receive.

If a party to this case failed to produce relevant evidence

which was peculiarly available to that party and that party did

not sufficiently explain why it was not produced, then you may

infer that the evidence would have been unfavorable to the

party.  If a party to this case failed to call a witness, who

could have given relevant testimony, even though the witness was

peculiarly available to that party and that party did not

sufficiently explain why he or she was not called, then you may

infer that the testimony would have been unfavorable to the

party.

However, you should not draw such an inference from the

absence of evidence or the absence of a material witness if the

evidence or witness was equally available to both sides.

Testimony of a witness may be discredited or impeached by

showing that he or she has previously made statements which are

inconsistent with his or her present courtroom testimony.  It is

for you to decide whether a witness made a statement on an

earlier occasion and whether it was in fact inconsistent with

the witness's testimony in court here.

If a witness at trial has been confronted with a prior

statement, which that witness made, and that prior statement is

inconsistent with his or her testimony here in court, then you

may consider the prior statement when you assess the

truthfulness of the testimony he or she gave in court.

If the witness made the prior inconsistent statement at a

deposition or otherwise under oath subject to the penalty of

perjury, then you may also treat the prior statement as evidence

in the case.  That is, you may treat what the witness said in

that prior statement as evidence like other evidence in the

case.

1    If the witness was not at the deposition, or otherwise

2    under oath subject to the penalty of perjury, when he or she

3    made the statement, then you may not treat the prior statement

4    as evidence of the facts in the statement.  You may consider the

5    statement only to evaluate the witness's credibility.  That is,

6    you may use the prior statement only to determine whether to

7    believe the witness's present testimony in court.

8    If you believe that any witness has been discredited or

9    impeached, then you should give his or her testimony the weight,

10   if any, that you judge it is fairly entitled to receive.

11   Now with respect to the specific claims in this case.  The

12   plaintiff, Brien O. Hill, alleges that the defendant, Associates

13   for Renewal in Education, violated the Americans with

14   Disabilities Act by failing to reasonably accommodate a known

15   disability.

16   Associates for Renewal and Education denies that claim

17   asserting that Mr. Hill had not made a request for that

18   accommodation.  Mr. Hill also alleges that ARE violated the

19   Americans with Disabilities Act by terminating his employment.

20   He claims that ARE terminated him because it was discriminating

21   on the basis of his disability or in retaliation for his having

22   asked for a reasonable accommodation.

23   ARE denies this claim and maintains that it was justified

24   in terminating Mr. Hill.

25   First with respect to the reasonable accommodation.  The

1    Americans with Disabilities Act, or ADA, requires an employer to

2    make reasonable accommodations for an employee's disability.  To

3    succeed in this case, Mr. Hill must prove each of the following

4    by a preponderance of the evidence.  Six items.

5        No. 1.  Mr. Hill had a disability.

6        No. 2.  Mr. Hill was a qualified individual.

7        No. 3.  ARE knew of Mr. Hill's disability.

8        No. 4.  Mr. Hill requested an accommodation.

9        No. 5.  A reasonable accommodation existed that would have

10   allowed Mr. Hill to perform the essential functions of his job.

11       No. 6.  ARE failed to provide a reasonable accommodation.

12       Now I'm going to define some of those terms that I just

13   mentioned.  I remind you to consider the specific definitions

14   that I give you and not to use your own opinions as to what

15   these terms may mean.

16       The first element requires that Mr. Hill prove by a

17   preponderance of the evidence that he has a disability.  A

18   disability is a physical or mental impairment that substantially

19   limits one or more major life activities.

20       Physical impairment in turn is a condition that prevents

21   the body from functioning normally.  A major life activity is an

22   activity that is essentially important to everyday life,

23   including the operation of major bodily functions.  Major life

24   activities include, among other things, caring for oneself,

25   performing a manual task, seeing, hearing, eating, sleeping,

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, communicating, and working.

An impairment substantially limits a major life activity if it prevents or significantly restricts a person from performing the activity compared to an average person in the general population.

An impairment that substantially limits one major life activity is a disability, even if it does not limit any other major life activity.  To decide whether Mr. Hill's amputated leg substantially limits his ability to perform a major life activity, such as walking or climbing stairs, you should consider, as compared to most people in the general population, the conditions under which Mr. Hill performs that activity, the manner in which he performs it, and how long it takes him to do so.

To decide whether Mr. Hill's impairment substantially limits his ability to perform a major life activity, it does not matter that his amputated leg can be corrected by the use of a prosthetic device.

The second element requires Mr. Hill to prove, by a preponderance of the evidence, that he is a qualified individual under the ADA.  The term qualified individual means an individual with a disability, who, with or without a reasonable accommodation, can perform the essential functions of the employment position that he holds.

He must satisfy the requisite skill, experience, education, and other job related requirements of the employment position. An essential function of a an employment position means the fundamental job duties of that position.  It does not include the marginal functions that may occur throughout the course of the job.

The factors you may consider in determining whether a function is essential to a particular position include:  Whether the functions performance is the reason the position exists; whether there are a limited number of employees available to perform the function; whether the function is highly specialized so that an employee in the position is hired for the ability to perform the function; ARE's judgment about which functions are essential to the position, the written job descriptions for the position, the amount of time an employee in the position spends performing the function, the consequences of not requiring an employee in the position to perform the function; or whether others who have held the position were required to perform the function.

But no single factor controls your decision.  You should consider all the evidence to decide whether a function is essential to the job.

For the third element, Mr. Hill must prove by a preponderance of the evidence that ARE knew about the disability.

1        For the fourth element, Mr. Hill must prove by a

2    preponderance of the evidence that he requested an

3    accommodation.  Mr. Hill did not have to provide a written

4    request, nor did he have to use the exact words, reasonable

5    accommodation.  He simply had to make clear that he wanted

6    certain assistance for his disability.

7        Put another way, the third and fourth elements require

8    Mr. Hill to prove that he informed ARE of both the substantial

9    limitations his disability created and his desire for an

10   accommodation.

11       The fifth element requires Mr. Hill to prove by a

12   preponderance of the evidence that a reasonable accommodation

13   existed that would have allowed Mr. Hill to perform the

14   essential functions of the job.  A reasonable accommodation is a

15   modification or adjustment of the employer's ordinary work

16   rules, facilities, or terms and conditions of employment that

17   the employer can make without causing an undue hardship.

18       A reasonable accommodation may include making existing

19   facilities readily accessible to and usable for Mr. Hill, job

20   restructuring, part-time or modified work schedules,

21   reassignment to a vacant position, acquiring or modifying

22   equipment or devices, or other similar accommodations for

23   individuals with disabilities.

24       But a reasonable accommodation does not require ARE to

25   change any essential function of employment, shift an essential

function of employment to other employees, or create a new
position for Mr. Hill.

The sixth element requires Mr. Hill to prove by a
preponderance of the evidence that ARE failed to provide a
reasonable accommodation.  In this case, Mr. Hill claims that
ARE should have reassigned him to a classroom on a lower level
of the building, where he would not have to walk up and down
several flights of stairs.

To decide whether ARE denied Mr. Hill a reasonable
accommodation, you should keep in mind that while an employer is
required to provide a reasonable accommodation that would allow
Mr. Hill to perform the essential job functions, the employer is
not required to provide the particular accommodation that
Mr. Hill prefers or requests.  There may be more than one
reasonable accommodation under the circumstances, and if
Mr. Hill refused to accept an accommodation offered by ARE that
would have allowed him to perform the essential job functions,
Mr. Hill has not proved that ARE failed to provide a reasonable
accommodation.

Now the discriminatory termination claim.  Mr. Hill has
also brought a claim that ARE discriminated against him by
terminating his employment because he had a disability within
the meaning of the Americans with Disabilities Act.  ARE denies
that claim and asserts that it had other justifications for
firing Mr. Hill.

1     Under the ADA, if a person is qualified to do the job, it

2     is unlawful for an employer to discharge the person because of

3     that person's disability.  To establish that claim under the

4     ADA, Mr. Hill must prove each of the following by a

5     preponderance of the evidence.  There are five elements.

6         No. 1.  Mr. Hill had a disability.

7         No. 2.  ARE knew of Mr. Hill's disability.

8         No. 3.  ARE terminated Mr. Hill's employment.

9         No. 4.  Mr. Hill was a qualified individual able to perform

10    the essential functions of his employment at the time of his

11    termination.

12        No. 5.  ARE discriminated against Mr. Hill by terminating

13    his employment based on his disability.

14        If you find that Mr. Hill has proven each of these elements

15    by a preponderance of the evidence, then you should enter a

16    verdict in favor of the plaintiff.  If on the other hand

17    Mr. Hill has failed to prove any of these elements, your verdict

18    should be for the defendant.  Some of these terms will be

19    familiar to you from the instructions that I just read to you a

20    moment ago.  For instance, the definition of disability and

21    qualified individual are the same for each of these claims.

22    Thus, I will not repeat myself now.

23        But remember that you can refer to the jury instructions

24    defining those terms.

25        I will however give further explanation as to the final

element.  Whether ARE discriminated against Mr. Hill because of

his disability.  ARE asserts that it acted lawfully with respect

to Mr. Hill and ultimately terminated him for legitimate

business reasons unrelated to his amputated leg.  The question

you must answer is whether Mr. Hill's disability played a role

in ARE's decision-making process and had a determinative

influence on his employer's decision to terminate him.

To determine that ARE terminated Mr. Hill because of his

disability, you must decide that ARE would not have terminated

Mr. Hill if he had not had a disability but everything else been

the same.  Mr. Hill does not have to prove that ARE did not have

other grounds to criticize his work, only that ARE would not

have terminated his employment if he had not been disabled.

Although Mr. Hill must prove that ARE acted with the intent

to discriminate on the basis of a disability, Mr. Hill is not

required to prove that ARE acted with the particular intent to

violate Mr. Hill's rights under the ADA.  Moreover, Mr. Hill is

not required to produce direct evidence of the defendant's

intent to discriminate, such as statements admitting

discrimination.

Intentional discrimination may be inferred from the

existence of other facts.  If you disbelieve the reasons ARE has

given for its decision to terminate Mr. Hill, you may infer that

ARE acted to terminate him because of his disability.  In

determining whether ARE's stated reason for its actions was a

pretext or excuse for discrimination, you must consider whether ARE's stated reason was the real reason or is merely a cover up for discrimination.

However, in considering whether the stated reason was the real reason, you must remember that if ARE did not act for discriminatory reasons, it had the right to exercise its business judgment to take employment actions as it sees fit.  As long as it is not unlawful.

Even if such actions appear to you unwise, ARE was entitled to exercise its business judgment so long as it did not act based on discrimination due to a disability.  You may not return a verdict for Mr. Hill just because you might disagree with ARE's decision to terminate his employment or believe it to be harsh or unreasonable.  If you believe ARE's reasons for its decisions and find that its decision was not because of Mr. Hill's disability, you must not second guess that decision, and you must not substitute your own judgment for ARE's judgment even if you did not agree with it.

Now retaliatory termination.  Mr. Hill also claims that ARE retaliated against him because he took steps to enforce his lawful rights under the Americans with Disabilities Act.  Laws that prohibit discrimination in the workplace also prohibit an employer from taking any retaliatory action against an employee because the employee has asserted rights or made complaints under those laws.

In this case, Mr. Hill claims that ARE terminated him because he had asked for a reasonable accommodation for his disability.  ARE denies Mr. Hill's claim and asserts that it had other justifications for firing Mr. Hill.  To succeed on this claim, Mr. Hill must prove each of the following by a preponderance of the evidence.  And there are four items.

No. 1.  Mr. Hill engaged in a protected activity.

No. 2.  ARE then took an adverse employment action.

No. 3.  ARE took the adverse employment action because of Mr. Hill's protected activity.

No. 4.  Mr. Hill suffered damages because of the adverse employment action.

As to the first element.  If you find that Mr. Hill requested a reasonable accommodation, then I instruct you that as a matter of law that action constitutes a protected activity.

For the second element, Mr. Hill claims that ARE took an adverse employment action against him when ARE terminated him. You must decide whether termination is an adverse employment action.  An adverse employment action is any type of action that would have made a reasonable employee reluctant to make or support a charge of discrimination.

Put another way, if a reasonable employee would be less likely to complain about or oppose alleged discrimination because he knew that ARE would terminate him, then that action is an adverse employment action.  If the employment action would

not make it less likely for a reasonable employee to make

complaints about or opposed the alleged discrimination, then

it's not an adverse employment action.

     For the third element, if you find that Mr. Hill engaged in

protected activity and that ARE took an adverse employment

action against him, you must decide whether ARE took that action

because of Mr. Hill's protected activity.

     Put another way, you must decide whether Mr. Hill's

protected activity was the main reason for ARE's decision.  To

determine that ARE took an adverse employment action because of

Mr. Hill's protected activity, you must decide that ARE would

not have taken the action had Mr. Hill not engaged in the

protected activity, but everything else had been the same.

     An employer may not take an adverse action against an

employee because of the employee's protected activity.  As I

explained earlier, however, an employer may terminate an

employee for any other reason, good or bad, fair or unfair.  If

you believe ARE's reasons for its decision and you find that ARE

did not make its decision because of Mr. Hill's protected

activity, you must not second guess that decision, and you must

not substitute your own judgment for ARE's judgment, even if you

do not agree with it.

     For the fourth element, you must decide whether ARE's acts

were the proximate cause of damages that Mr. Hill sustained.

Put another way, you must decide whether, if ARE had not

1    terminated Mr. Hill, would these damages still have occurred?

2    If you find that ARE's acts were the proximate cause of damages

3    that Mr. Hill sustained, you must determine the amount of

4    damages.

5        I'm now going to instruct you about how to calculate

6    damages.  You should not consider the fact that I am giving you

7    this instruction, or these instructions, as suggesting any view

8    of mine as to which party is entitled to your verdict in this

9    case or that I think you should award damages.  Those decisions

10   are entirely for you to make.

11       I'm giving you these instructions solely for your guidance

12   in the event that you find in favor of Mr. Hill on one of his

13   claims against Associates for Renewal in Education and you

14   decide to award him damages.  If you find for the plaintiff,

15   then you must award the plaintiff a sum of money which will

16   fairly and reasonably compensate him for all the damage which he

17   experienced that was proximately caused by the defendant.

18       The plaintiff is entitled to damages that the defendant's

19   wrongful conduct proximately caused.  The defendant is liable

20   only for the damages that its conduct caused.  If you find the

21   defendant's conduct only caused part of the plaintiff's damages,

22   then the defendant is liable only for that part.

23       The burden of proof is on the plaintiff to establish all

24   elements of his damages by a preponderance of the evidence.

25   Plaintiff must prove his damages with reasonable certainty.  You

may only award the plaintiff damages for past, present, or future harm that is not speculative.  Speculative damages are those that might be possible but are remote or based on guesswork.

Plaintiff does not have to prove his exact damages, however.  You may award the plaintiff damages that are based on a just and reasonable estimate derived from relevant evidence. Similarly, the plaintiff does not need to show that there is an absolute certainty that the injury or loss will continue into the future.  You may award damages to compensate the plaintiff for injury and losses that probably will continue.  You may award damages for any of the following that you find the defendant's conduct proximately caused.

No. 1.  The extent and duration of any physical injuries sustained by the plaintiff.

No. 2.  The effects that any physical injuries have on the overall physical and emotional well being of the plaintiff.

No. 3.  Any physical pain or emotional distress including fright, shame, anxiety, or humiliation that the plaintiff has suffered in the past.

No. 4.  Any physical pain or emotional distress that the plaintiff may suffer in the future.

No. 5.  Any inconvenience the plaintiff has experienced or may experience in the future.

You may not, however, award compensatory damages for any

1   back pay, lost wages, or lost benefits that Mr. Hill would have

2   earned if he had continued in employment with ARE.  It is not

3   your function to award Mr. Hill any damages for past or future

4   salary and benefits lost.  That is solely the judge's function.

5        If you find for Mr. Hill, then I, the Court, will award

6   those damages.  In determining the amount of any damages that

7   you decide to award, you should be guided by dispassionate

8   common sense.  You must use sound discretion in fixing the

9   amount of damages, drawing reasonable inferences from the facts

10   in evidence.

11        You may not award damages based on sympathy, prejudice,

12   speculation, or guesswork.  On the other hand, the law does not

13   require that a plaintiff prove the amount of his losses with

14   mathematical precision but only with as much definiteness and

15   accuracy as circumstances permit.  The compensatory damages that

16   you award must be fair compensation.  No more, and no less.

17        In addition to compensatory damages, Mr. Hill also seeks an

18   award of punitive damages against the defendant.  Punitive

19   damages are damages above and beyond the amount of compensatory

20   damages you may award.  Punitive damages are awarded to punish

21   the defendant for its conduct and serve as an example to prevent

22   others from acting in a similar way.

23        You may award punitive damages only if the plaintiff has

24   proved by clear and convincing evidence, first, that the

25   defendant acted with evil motive, actual malice, deliberate

violence, or oppression, or with intent to injure or in willful
disregard for the rights of the plaintiff.  And second, that the
defendant's conduct itself was outrageous, grossly fraudulent,
or reckless toward the safety of the plaintiff.

In addition, you must also conclude from clear and
convincing evidence that the officers, directors, or managing
agents of the corporation participated in the act, authorized
the act, or approved the act before or after it was done.  You
may conclude that the defendant acted with a state of mind
justifying punitive damages based on direct evidence or based on
circumstantial evidence from the facts of the case.

Clear and convincing evidence means that you must be
persuaded by the evidence that the issue to be proven is highly
probable.  This is a higher standard of proof than proof by a
preponderance of the evidence, the standard of proof you use to
decide which party was entitled to your verdict.  If you find
that the plaintiff is entitled to an award of punitive damages,
then you must decide the amount of the award.

To determine the amount of the award, you may consider the
relative wealth of the defendant at the time of trial, the
nature of the wrong committed, the state of mind of the
defendant when the wrong was committed, the cost and duration of
the litigation, and any attorney's fees that the plaintiff
incurred in this case.  Your award should be sufficient to
punish the defendant for its conduct and to serve as an example

1   to prevent others from acting in a similar way.

2          If you find, after considering all of the evidence

3   presented, that ARE violated Mr. Hill's rights but that Mr. Hill

4   suffered no injury as a result of this violation, you may award

5   him nominal damages.

6          Nominal damages are awarded as recognition that the

7   plaintiff's rights have been violated.  Nominal damages may not

8   be awarded for more than a token sum, usually one dollar.  It is

9   up to you to determine if plaintiff has proven that he has been

10  damaged, and if so, in what amount.

11         You would award nominal damages if you conclude that the

12  only injury that the plaintiff suffered was the deprivation of

13  his rights under the Americans with Disabilities Act without any

14  resulting emotional or financial damage.  You may also award

15  nominal damages if upon finding that some injury resulted from

16  unlawful discrimination or retaliation you find that you are

17  unable to compute monetary damages except by engaging in pure

18  speculation and guesswork.

19         You may not award both nominal and compensatory damages.

20  Either Mr. Hill was measurably injured, in which case you should

21  award compensatory damages, or else he was not, in which case

22  you may award nominal damages or find it that he is not entitled

23  to any damages.

24         Now, for your conduct as jurors.  When you return to the

25  jury room, you should select a foreperson to preside over your

deliberations and to be your spokesperson here in court.  There are no specific rules regarding how you select the foreperson. That is up to you.

However, as you go about the task, be mindful of your mission:  To reach a fair and just verdict based on the evidence.  Consider whether you wish to select a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of the evidence.

The verdict must represent the considered judgment of each juror.  In order to return a verdict, each juror must agree with the verdict.  Your verdict must be unanimous.  I will be sending into the jury room with you the exhibits that have been received in evidence.  You may examine any or all of them as you consider your verdict.

If it becomes necessary during your deliberations to communicate with me, you may send a note by the clerk or the marshal, signed by your foreperson or by one or more members of the jury.  No member of the jury should try to communicate with me, by any means, other than through a signed note.  And I will never communicate with any member of the jury on any matter touching the merits of this case, except in writing or orally here in court.

1    Bear in mind also that you are never, under any

2    circumstances, to reveal to any person, not to the clerk, the

3    marshal, or me, how the jury stands on the issues until after

4    you have received -- or reached a unanimous verdict.  This

5    means, for example, that you never should state to the Court

6    that the jury is divided 5 to 3, 6 to 4, 7 to 2, or in any other

7    fashion, whether for plaintiff or defendant.

8    During your deliberations, you must not communicate with or

9    provide any information to anyone, by any means, about this

10   case.  You may not use any electronic device or media such as

11   the telephone, cell phone, smart phone, iPhone, BlackBerry or

12   computer; the Internet, any Internet service, any text or

13   instant messaging service or any Internet chat-room, blog, or

14   website's such as Facebook, Myspace, LinkedIn, YouTube, Twitter,

15   to communicate to anyone any information about this case or to

16   conduct any research about this case, until I accept your

17   verdict.

18   In other words, you cannot talk to anyone on the phone,

19   correspond with anyone, or electronically communicate with

20   anyone about the case.  You can only discuss the case in the

21   jury room with your fellow jurors during deliberation.

22   I expect you will inform me as soon as you become aware of

23   another juror's violation of these instructions.

24   As I've instructed you previously, in some cases, although

25   not necessarily this one, there may be reports in the newspaper,

radio, television, or Internet concerning the case while

deliberations are going on.  If there should be should media

coverage in it case, you may tempted to read, listen to, or

watch it.  You must not listen to or read such reports, and you

must decide the case based solely on the evidence in the

courtroom.  This includes any electronic communications such as

e-mail or text or any blogging about the case.

In addition, you may to the conduct any independent

investigation during deliberations.  This means that you may not

conduct any research in person or electronically via the

Internet or in any other way.  You must consider only evidence

that meets certain standards in reaching your verdict.

For example, witnesses must be sworn to tell the truth;

they must be subject to cross-examination.  News reports about

the case are not subject to these standards.  And if you read,

listen to, or watch these reports, you may be exposed to

misleading or inaccurate information that unduly favors one side

of the case and to which the other side is unable to respond.

Therefore, you must completely disregard any press,

television, radio, or Internet reports that you may read, see,

or hear.  Such reports are not evidence, and you should not be

influenced in any manner, whatever, by such publicity.

If any publicity about the trial inadvertently comes to

your attention during your deliberations, please do not discuss

it with other jurors or anyone else.  Just let me or the clerk

1    or marshal know as soon after it happens as you can.  I will

2    then briefly discuss it with you to make sure it does not

3    present any problems.  In fairness to both sides, it is

4    essential that you comply with that instruction.

5         Now, as I mentioned earlier, I will provide you with a copy

6    of my instructions.  During your deliberations, you may, if you

7    want, refer to these instructions.  While you may refer to any

8    particular portion of the instructions, you are to consider the

9    instructions as a whole, and you may not follow some and ignore

10   others.

11        The fact that you have been provided with a copy of my

12   instructions should not discourage you from making an inquiry

13   regarding the meaning of these instructions if that becomes

14   necessary.  Please return the instructions to me when your

15   verdict is returned.

16        During the trial, I have permitted those jurors who wanted

17   to do so to take notes.  You may take your notes with you to the

18   jury room and use them during your deliberations if you wish.

19   As I told you at the beginning of the trial, you're notes are

20   only to be an aid to your memory.  They are not evidence in the

21   case, and they should not replace your own memory of the

22   evidence.

23        Those jurors who have not taken notes should rely on their

24   own memory of the evidence.  The notes are intended to be for

25   the note takers only person use.  The end of your deliberations,

the clerk will collect your notebooks and pencils when you return to the courtroom.  We will destroy your notes immediately after the trial.  No one, including myself, will look at them.

You will be provided with a verdict form for use when you have concluded your deliberations.  The form is not evidence in the case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be.  Nothing in the form replaces the instructions of law that I have already given you, and nothing in it replaces or modifies the instructions about the essential elements of the claims that must be proven.

The form is meant only to assist you in recording your verdict.  The form consists of a few questions on three pages. You should record your verdict on this form only after you have reached a unanimous verdict.  It should then be signed and dated by the foreperson.  If you think it might help in your deliberations, you may consider reviewing the verdict form early in your deliberations to get a sense of the issues that you need to address.

Please remember that nothing said in these instructions and nothing in the verdict form is meant to suggest or convey, in any way or manner, my belief as to what the verdict I think you should return is.  What the verdict shall be is your sole and exclusive duty and responsibility.

Now the best word you've heard.  Lastly, I want to mention

one or two matters before you begin your deliberations.  These

concern how your verdict will be delivered.  When you have

reached your verdict, just send me a note telling me you have

reached a verdict and have your foreperson sign the note.

Don't tell me what your verdict is, and do not send your

verdict form out.  I will find out your verdict by asking your

foreperson to provide the verdict form and the verdict will then

being stated in open court after you have finished your

deliberations and returned to court.

Don't be surprised when your verdict is returned if one of

the parties asks that the jury be polled.  The reason for

polling the jury is because each party has a right to be sure

that your verdict is unanimous.  Polling means that after the

foreperson states your verdict, I will ask each of you

individually whether your verdict agrees with that announced.

Your job is easy.  If you agree with the verdict, you

should simply say yes when I call the number of your jury seat.

If you disagree in any way, you should simply say no.  Do not

say anything other than yes or no in response to a poll of the

jury.  Do not say anything during the poll unless and until your

seat number is called.

Members of the jury, at this time you may retire to begin

your deliberations.  We will send in the jury instructions and

the verdict form and the exhibits shortly.  Lunch should be

there waiting for you.  I will remind you at this time of one

1  thing, and that is; please do not conduct deliberations without

2  all eight members of the jury being present, and the foreperson

3  of the jury should help ensure that.  And I'll also tell you

4  that at the end of the day today, which will be about 4:30

5  because I have an engagement that I have to get to, if you have

6  not reached a verdict, I'll bring you into the courtroom and

7  dismiss you for the day and then you'll return on Monday.

8      With that, Mr. Bradley, please show the jury to the jury

9  room.

10     (Jury out at 12:26 p.m.)

11         THE COURT:  All right.  Mr. Hill and Mr. Padgett, the

12  case is submitted to the jury.  They'll work on it.  I'd like to

13  be able to get in contact with you if we need you for any

14  question that the jury has that I need to go over with you.  Or,

15  when the jury returns a verdict.

16     Mr. Hill, are you going to remain in the courthouse?

17         MR. HILL:  Yes, sir.

18         THE COURT:  Mr. Padgett, where are you going to be?

19         MR. PADGETT:  At least I'm going to go out to take a

20  walk and get some lunch.

21         THE COURT:  Oh, that I understand completely.  Do you

22  expect to be here this afternoon, though, in the general area?

23         MR. PADGETT:  Yes.

24         THE COURT:  Just make sure that Mr. Bradley has phone

25  numbers so he can reach each of you immediately, when we need

1    you.  He needs to be able to get in touch with you promptly.

2    And my expectation is that if we have a note and need you back

3    here, that you'll be able to get back here in 10 minutes or so.

4    And I hope that's not an inconvenience for you.

5        I do have to break early this afternoon because I have to

6    be somewhere.  So I'll discharge the jury at 4:30 if they

7    haven't reached a verdict.

8              MR. PADGETT:  May I ask one question?

9              THE COURT:  Yes.

10             MR. PADGETT:  Will the courtroom be unlocked?

11             THE COURT:  Yes.  We'll leave the courtroom unlocked

12   so you can come in and out and use your materials.  And I'm

13   waiting for Mr. Bradley now because he's indicated that he has

14   some issues with respect to exhibits.

15             MR. HILL:  Your Honor?

16             THE COURT:  Yes.

17             MR. HILL:  I'll be in the building.  I'm not leaving

18   the building, and they have my cell phone, but I'm still giving

19   my number.

20             THE COURT:  You mean you had to turn your cell phone

21   in when you came in.

22             MR. HILL:  Yeah.  Every day.

23             THE COURT:  Do you have a cell phone?

24             MR. PADGETT:  Yes, I do.

25             THE COURT:  I think Mr. Bradley will probably have to

1    take you down and have the marshals give you your cell phone so

2    that you can be reached.

3             MR. HILL:  Perfect.

4         (Deputy clerk reenters.)

5             THE COURT:  All right.  Mr. Bradley indicated that

6    he's shown you the note from earlier, where the jury only

7    received a partial copy of Defendant's Exhibit 1, and we took

8    care of that.  We gave them the full copy.

9         We now have another note that indicates "we have reached a

10   verdict."  So I will bring in the jury, and we will check the

11   verdict.  And then if it's in order, we will receive the

12   verdict.  So let's bring the jury in.

13        (Jury in at  4:47 p.m.)

14                        JURY VERDICT

15            THE COURT:  Good afternoon, ladies and gentlemen.

16   I have your note that indicates that you have reached a verdict.

17   Who is your foreperson?  Could you hand the verdict sheet to the

18   marshal, please.  And has the jury reached a unanimous verdict?

19            FOREPERSON:  Yes, we have.

20            THE COURT:  All right.

21        All right.  I reviewed the verdict, and it is in order,

22   and I will now be publishing your verdict.  I would ask that you

23   listen closely, pay attention.  It's possible that there may be

24   a request to poll the jury, in which case I would ask you

25   individually whether the verdict, as published, constitutes

1    your individual verdict.  I'll now read the verdict:

2        No. 1.  Has plaintiff Brien O. Hill proven, by a

3    preponderance of the evidence, that he requested a reasonable

4    accommodation from defendant Associates for Renewal in

5    Education, Inc.?

6        Yes.

7        If you answered yes, has plaintiff Brien O. Hill proven, by

8    a preponderance of the evidence, that defendant, Associates for

9    Renewal in Education, Inc., failed to provide a reasonable

10   accommodation in violation of the Americans with Disabilities

11   Act?

12       Yes.

13       If you answered yes to the second part of this question,

14   state the amount of compensatory damages, if any, that you award

15   to plaintiff Brien O. Hill on this claim.

16       Amount: $5,000.

17       If you answered yes to the second part of this question,

18   state the amount of punitive damages, if any, that you award to

19   plaintiff Brien O. Hill on this claim.

20       Amount: $35,000.

21       Question No. 2.  Has plaintiff Brien O. Hill proven

22   by a preponderance of the evidence that defendant, Associates

23   for Renewal in Education Inc., violated the Americans with

24   Disabilities Act by discriminating against him on the basis

25   of his disability when it terminated his employment?

1     No.

2     Question No. 3.  Has plaintiff Brien O. Hill proven by a

3     preponderance of the evidence that defendant, Associates for

4     Renewal in Education, Inc., violated the Americans with

5     Disabilities Act by terminating his employment in retaliation

6     for engaging in protected activity under that Act?

7     No.

8     THE COURT:  And that is the verdict of the jury.

9     Any request for polling from either side?

10     MR. PADGETT:  Yes, Your Honor.

11     THE COURT:  All right.  I'm going to poll the jury,

12     then.  What that means is that I will ask each of you, using

13     your seat number, to just stand and answer yes or no to my

14     question, and my question will be whether the verdict as

15     published is your individual verdict in all respects.  I won't

16     repeat that question each time.

17     So the question is: Does the verdict, as published, as I

18     just read it, constitute your individual verdict?  Yes or no

19     answer.  Seat No. 1.

20     JUROR:  Yes, Your Honor.

21     THE COURT:  Juror in seat No. 2.

22     JUROR:  Yes, Your Honor.

23     THE COURT:  Seat No. 3.

24     JUROR:  Yes, Your Honor.

25     THE COURT:  Seat No. 4.

1          JUROR:  Yes, Your Honor.

2          THE COURT:  Seat No. 5.

3          JUROR:  Yes, Your Honor.

4          THE COURT:  Seat No. 6.

5          JUROR:  Yes, Your Honor.

6          THE COURT:  Seat No. 7.

7          JUROR:  Yes, Your Honor.

8          THE COURT:  And seat No. 8.

9          JUROR:  Yes, Your Honor.

10          THE COURT:  All right.  Thank you.  The jury has been

11    polled, and the polling indicates a unanimity of verdict, and I

12    will therefore direct Mr. Bradley to file and record the

13    verdict.

14          And with that, ladies and gentlemen, your job is finished.

15    I want to thank you again for your patience throughout the

16    course of the trial, your attentiveness, and your careful

17    deliberation.  And with that, I'm going to discharge the jury,

18    unless there's anything further from either side?

19          All right.  Ladies and gentlemen, have a wonderful weekend.

20    Thank you again for your service to the community.

21          (Jury out at 4:53 p.m.)

22          THE COURT:  All right.  Anything further from the

23    parties?  We have a verdict.  I don't believe there is any task

24    for the Court, with respect to back pay or benefits, because

25    those only relate to the termination claims, not to the

1   reasonable accommodation claims.

2        So I don't think there's any computation or determination

3   that I have to make on that.  The verdict is beneath any limits

4   that would be applicable with respect to ARE based on its size.

5   There are limitations under the law, but the verdict is below

6   that.  So anything from either side at this point?

7            MR. HILL:  No, sir, Your Honor.  Not for plaintiff.

8            MR. PADGETT:  I would like to have an opportunity to

9   review the law and with my client, the question about punitive

10  damages and the standard --

11           THE COURT:  I understand.

12           MR. PADGETT:  -- of punitive damages in the District

13  of Columbia.

14           THE COURT:  I think you have some time to file a

15  motion.  You don't have to do it orally now.  You should consult

16  the rules and make sure you act within that time limit.

17           MR. PADGETT:  Of course.

18           THE COURT:  Okay.  With that, thank you all very much,

19  and we will have that verdict recorded, and I will hear from you

20  as appropriate.

21           MR. PADGETT:  Thank you, Your Honor.

22           THE COURT:  Good day to you.  Thank you.

23               (Proceedings adjourned at 4:55 p.m.)

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_Bryan A. Wayne_
BRYAN A. WAYNE